## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MULTI AG MEDIA, LLC,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 05-1908 (HHK)** |
| | ) |
| **DEPARTMENT OF AGRICULTURE,** | ) |
| | ) |
| **Defendant.** | ) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Department of Agriculture, by and through its undersigned attorneys and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby respectfully moves for summary judgment in this action brought pursuant to the Freedom of Information Act, 5 U.S.C. § 552. Summary judgment is sought on the grounds that there are no material facts in dispute and that defendant is entitled to judgment as a matter of law.

A statement of material facts as to which there is no genuine dispute and a memorandum of points and authorities with supporting declarations and exhibits are filed herewith.

Respectfully submitted,

_____/s/_____
KENNETH L. WAINSTEIN , D.C. Bar # 451058
United States Attorney

_____/s/_____
R. CRAIG LAWRENCE, D.C. Bar # 171538
Assistant United States Attorney

-1-

_____/s/_____
PETER D. BLUMBERG, Bar # 463247
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7157

Dated: February 15, 2006

OF COUNSEL:
Karen Carrington
United States Department of Agriculture

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MULTI AG MEDIA, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-1908 (HHK)** |
| | ) | |
| **DEPARTMENT OF AGRICULTURE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S MEMORANDUM OF POINTS
### AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**I.    FACTUAL BACKGROUND**

    **A.    Processing of the Multi Ag Media, LLC ("Multi Ag Media") FOIA Request**

On July 13, 2005, Multi Ag Media submitted a Freedom of Information Act ("FOIA")

request to the Farm Service Agency ("FSA") (a subcomponent of the Department of

Agriculture), Kansas City Administrative Office ("KCAO"), requesting records from FSA

electronic, tabular databases pertaining to twelve listed programs and for the "fully attributed file

with digitized farm field boundaries" including listed specifications for the calendar year 2005.

See Declaration of Robin Wieland ("Wieland Dec.") at ¶ 4 and Exhibit ("Ex.") A thereto.[1]

Specifically, Multi Ag Media requested copies of 2005 program year information from the

following twelve electronic, tabular databases:

---

[1] Robin Wieland is a Freedom of Information Act/Privacy Act Paralegal Specialist
(FOIA/PA) with the United States Department of Agriculture (USDA), FSA.  Her duties as
FOIA/PA Paralegal Specialist include responding to requests filed under the FOIA, 5 U.S.C. §
552 and the Privacy Act, 5 U.S.C. § 552a, seeking FSA records.  She is the FSA employee who
evaluated the FOIA appeal submitted by Multi Ag Media, LLC.  See id. at ¶¶ 1-2.

      a.      Participating Producer File,
      b.      Producer Payment Reporting System,
      c.      Producer Type Code File,
      d.      Permitted Entity File,
      e.      Livestock Compensation Program ("LCP"),
      f.      Tobacco Files,
      g.      Compliance File,
      h.      Agricultural Market Transition Act File ("AMTA"),
      i.      Direct and Counter Cyclical Payment Program File ("DCP"),
      j.      Conservation Reserve Program File for Sign Up 26 and later ("CRP"),
      k.      Actual Production History File ("APH"),
      l.      Livestock Assistance Program ("LAP").

See id. In addition to the 12 electronic, tabular databases, Multi Ag Media requested a copy of the entire fully attributed Geographic Information System ("GIS"), Common Land Units ("CLU") for the 48 contiguous United States. See id. at ¶ 5. The FOIA request sought a copy of a:

> fully attributed file with digitized farm field boundaries, in shape file spatial data format, classified as farm and/or field boundaries, name and address, farm number, field number, tract number, acres, all spatial attributes and coordinates, as well as projection information as attached to these boundaries.

See id. and Ex. A.

On August 8, 2005, the KCAO FOIA Officer granted Multi Ag Media's FOIA request in part and denied it in part. The KCAO disclosed the Participating Producer File, the Producer Payment Reporting System, and the Producer Type Code File in full to Multi Ag Media. See id. at ¶ 6 and Ex. B. Containing nearly 3 million records, the Participating Producer File has the names and addresses of agricultural producers and entities that received a payment in at least one program administered by FSA in calendar year 2005. See id. at ¶ 7 and Ex. C. With nearly 22 million records, the Producer Payment Reporting System reveals the payments issued by FSA to agricultural producers and entities in the 2005 program year. (Names and addresses of payment

recipients are not included in this file.)  See id. and Ex. D.  The Producer Type Code File, with

some 30 million records, indicates the status of the agricultural producer or entity as an owner,

operator, or tenant of the farming operation.  See id. and Ex. E.

In responding to Multi-Ag's FOIA request, the KCAO determined that the Permitted

Entity, Tobacco, and LCP Files should be released in part.  See id. at ¶ 8 and Exs. F, G, and H.

In addition, the KCAO concluded that the following files should be withheld in full: Compliance

File, AMTA File, DCP File, CRP File, and APH File.  See id. and Exs. B.  The KCAO

determined that particular electronic, tabular databases should either be withheld in part or in full

on the basis of Exemption 6 of the FOIA, 5 U.S.C. § 552(b)(6).  See id. at ¶ 9.  With respect to

the LAP File, the KCAO did not make a determination because this file was not available.  See

id. at ¶ 10 and Ex. B.  As for the GIS, CLU database, the KCAO referred this portion of Multi Ag

Media's FOIA request to the USDA, Aerial Photography Field Office, in Salt Lake City, Utah.

See id. and Ex. B.

**B.      The Processing of the Multi Ag Media FOIA Appeal**

Multi Ag Media submitted a FOIA appeal to FSA on or about August 24, 2005.  See id.

at ¶ 11 and Ex. N.  The FOIA appeal was processed by the FSA, Appeals and Litigation Staff,

which is based in Washington, D.C.  As required by regulation, if FSA decides to deny a FOIA

appeal either in part or in full, the Administrator of FSA issues the final determination with

respect to FOIA appeals.  See id. at ¶ 12.

On November 23, 2005, FSA granted Multi Ag Media's FOIA appeal in part and denied

it in part.  See id. at ¶ 13.  On appeal, FSA issued a final determination with respect to electronic

data pertaining to individual farmers and agricultural producers.  In response to the appeal, FSA

determined that the Tobacco File and the Permitted Entity Files should be disclosed in full. As for the following electronic tabular files, which were withheld in full initially, FSA determined on appeal that they should be provided in redacted form: Compliance File, AMTA, DCP, CRP, and, APH. See id. and Ex. O.

With respect to the LAP file, which was not available when Multi Ag Media's request was considered initially, FSA concluded that said file should be provided in redacted form on appeal. See id. at ¶ 14 and Ex. O. As for the LCP file, FSA determined that this electronic file should continue to be provided in redacted form. See id. Regarding the GIS, CLU database, FSA determined that it should be provided to Multi Ag Media in part. See id. and Ex. O.

As for electronic data concerning farming operations that are business entities, FSA did not issue a final determination on Multi Ag Media's FOIA appeal. See id. at ¶ 15. FSA refrained from issuing a decision concerning electronic data pertaining to business entities because the electronic, tabular databases at the KCAO could not distinguish whether a business entity is a closely held one. See id. and Ex. O. Generally, for the purposes of Exemption 6 of the FOIA, FSA views owners and operators of farming operations that are closely held businesses as being similar to individual farmers and producers. Typically, such businesses are small family farms in which the financial makeup of the businesses mirrors the financial situation of the individual family members. See id. at ¶ 16. FSA does not apply Exemption 6 to information pertaining to non-closely held businesses as such businesses do not have any legally recognized privacy interests under the FOIA. See id.; see also Part III.A (discussing the case law construing Exemption 6).

The computer database located in KCAO cannot distinguish whether a business entity is closely held. Therefore, FSA has determined that the only way to ascertain which entities are not non-closely held businesses, for the purposes of determining what information is releaseable under FOIA, is to conduct a search of non-electronic records maintained in approximately 2,500 FSA county offices. FSA estimates that the cost to conduct such a search to be $1.2 million. See Exhibit P. The process used to determine which business entities are considered non-closely held would be imperfect because employees in each individual FSA county office would make this determination based on their own judgment. Further, due to the nature of FSA programs, virtually all of the databases at issue contain information pertaining to individual producers or closely held entities. FSA believes that the results of such a search would reveal a very small number of businesses, likely no more than two percent.

On February 15, 2006, FSA issued its determination with respect to certain data contained in the LAP File and Compliance File that had been withheld on appeal. FSA determined that additional information from the LAP File should be released. See id. at ¶ 18. On further review of the fields that comprise each record in the Compliance File, certain data is no longer collected and maintained by FSA; therefore with respect to the Compliance File, this information does not exist. See id. at ¶ 18 and Ex. Q.

**C.     Related FOIA Requests Submitted by Multi Ag Media**

After FSA resolved the FOIA appeal, it learned that Multi Ag Media submitted additional FOIA requests to the KCAO on October 3 and October 6, 2005, respectively. See id. at ¶ 19. The October 3, 2005, FOIA request was logged in as 06-02, and the October 6, 2005, FOIA request was acknowledged as 06-07. See id. and Exs. R and S. The October 3, 2005, FOIA

request (06-02) was nearly identical to the request submitted by Multi Ag Media on July 13, 2005. See id. at ¶ 20. The KCAO processed the October 3, 2005, request partially and provided Multi Ag Media with copies of the 2005 calendar year AMTA File, 2005 calendar year DCP File, and 2005 calendar year APH File in full on October 12, 17, 19, and 20, 2005. See id. and Exs. T, U and V. With respect to the October 6, 2005, FOIA request, the KCAO processed said request completely. See id. at ¶ 21. In response to said request, the KCAO provided Multi Ag Media with a copy of the CRP file in full on October 19, 2005. See id. and Ex. W.

As a result of the responses of the KCAO to the October 3, 2005, and October 6, 2005 FOIA requests submitted by Multi Ag Media, FSA withdraws its assertion of Exemption 6 of the FOIA to withhold information from the following electronic files for 2005 program year data: a) AMTA File, b) DCP File, c) APH File, and d) CRP File. See id. at ¶ 22.

FSA continues to invoke Exemption 6 of the FOIA to withhold information from the following electronic databases: a) LCP File; b) LAP File; c) Compliance File; and d) GIS, CLU Database. See id. at ¶ 23. In addition, in responding to Multi-Ag Media's Complaint, FSA has concluded that certain information sought through the FOIA request is also exempt from disclosure under FOIA Exemption 2, 5 U.S.C. § 552(b)(2) (records related solely to the internal personnel rules and practices of an agency). See id. at ¶ 24.

## II.  STANDARD OF REVIEW

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides that the "judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Where no genuine dispute exists as to any material fact, summary judgment is required. Anderson v. Liberty Lobby, Inc., 477 U.S. 242

(1986). A genuine issue of material fact is one that would change the outcome of the litigation. Id. at 248. "The burden on the moving party may be discharged by 'showing' -- that is, pointing out to the [Court] -- that there is an absence of evidence to support the non-moving party's case." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1563 (Fed. Cir. 1987), (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (emphasis in original)).

Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must instead proffer specific facts showing that a genuine issue exists for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Thus, to avoid summary judgment, the plaintiff must state specific facts or present some objective evidence that would enable the court to find he is entitled to relief. In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Supreme Court held that, in responding to a motion for summary judgment, the party who bears the burden of proof on an issue at trial must "make a sufficient showing on an essential element of [his] case" to establish a genuine dispute. Id. at 322-23.

In an opinion issued the same day as Celotex, the Supreme Court attempted to explain under what circumstances summary judgment is appropriate:

> If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted . . . [T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50, 252. See Johnson v. Digital Equipment Corp., 836 F. Supp. 14, 15 (D.D.C. 1993). In Celotex, the Supreme Court further instructed that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the

-7-

just, speedy and inexpensive determination of every action.'"  477 U.S. at 327.

FOIA cases are typically resolved on summary judgment.  See Cooper Cameron Corp. v. Department of Labor, 280 F.3d 539, 543 (5th Cir. 2002).  To discharge its burden, the defendant-agency must prove that each document that falls within the class of requested records has either been produced, is unidentifiable, or is exempt.  See National Cable Television Ass'n, Inc. v. Federal Communications Commission, 479 F.2d 183, 186 (D.C. Cir. 1973).  In a FOIA case, the Court typically adjudicates summary judgment solely on the basis of information provided in affidavits or declarations when the affidavits or declarations describe, "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).  See also Weisberg v. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984).   The Court exercises de novo review over FOIA matters, and the burden is on the agency to justify all nondisclosures.  See 5 U.S.C. § 552(a)(4)(B); Department of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989).

## III.    RECORDS WITHHELD UNDER FOIA EXEMPTION 6

### A.    FOIA Exemption 6

Exemption 6 protects information about individuals in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  The exemption is meant "to protect individuals from a wide range of embarrassing disclosures," pertaining to the intimate details of their lives.  Rural Housing Alliance v. Department of Agriculture, 498 F.2d 73, 77 (D.C. Cir. 1974).  The Supreme

Court has declared that the phrase "personnel and medical files" is to be interpreted broadly, and that all information that "applies to a particular individual" qualifies for consideration under this exemption.  Department of State  v. Washington Post Co., 456 U.S. 595, 602 (1982).  "The exemption [was] intended to cover detailed Government records on an individual which can be identified as applying to that individual." Id, (quoting H.R.Rep.No.1497, U.S.Code Cong. & Admin.News 1966, p. 2428); see also New York Times Co. v. NASA, 920 F.2d 1002, 1005 (D.C. Cir. 1990) (en banc); Chang v. Dep't of Navy, 314 F. Supp.2d 35, 42-43 (D.D.C. 2004).

        In general, neither corporations nor business associations possess protectible privacy interests.  See Sims v. CIA, 642 F.2d 562, 572 n. 47 (D.C. Cir. 1980); National Parks & Conservation Ass'n v. Kleppe, 547 F.2d 673, 685 n.44 (D.C. Cir. 1976).  However, where the business is a closely held corporation, and the release of information essentially results in the release of personal financial information, the privacy interests in not having that information made public has been recognized.  "While corporations have no privacy, personal financial information is protected, including information about small businesses when the individual and corporation are identical."  Providence Journal Co. v. FBI, 460 F. Supp. 778, 785 (D.R.I. 1978), rev'd on other grounds, 602 F.2d 1010 (1st Cir. 1979); see also Campaign for Family Farms v. Glickman, 200 F.3d 1180, 1189 (8th Cir. 2000) ("An overly technical distinction between individuals acting in a purely private capacity and those acting in an entrepreneurial capacity fails to serve the exemption's purpose of protecting the privacy of individuals."); Beard v. Espy, No. 94-16748, 1995 WL 792071 at *1 (9th Cir. Dec. 11, 1995); National Parks, 547 F.2d at 685-86; Doe v. Veneman, 230 F. Supp.2d 739, 748-51 (W.D. Tex 2002), aff'd in part, rev'd in part, 380 F.3d 807 (5th Cir. 2004).

Once it has been established that the information qualifies under Exemption 6, the inquiry then turns to whether disclosure would result in a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This requires a balancing of the public's interest in disclosure against the individual's right to privacy. See Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749 (1989); Department of Air Force v. Rose, 425 U.S. 352, 372 (1976). Of course, if no valid public interest in release exists, the information necessarily should be protected; as the D.C. Circuit has observed, "something, even a modest privacy interest, outweighs nothing every time." National Ass'n of Retired Federal Employees v. Horner, 879 F.2d 873, 879 (D.C. Cir. 1989) ("NARFE"); see also Horowitz v. Peace Corps, 428 F.3d 271, 278 (D.C. Cir. 2005).

The burden on establishing that disclosure would benefit the public interest falls on the requester. See Carter v. United States Department of Commerce, 830 F.2d 388, 391 nn.8 & 13 (D.C. Cir. 1987). In Reporter's Committee, the Supreme Court clarified what was meant by the term "public interest," holding that it was limited to "the kind of public interest for which the Congress enacted the FOIA"; namely, to "shed[] light on an agency's performance of its statutory duties." See Reporter's Committee, 489 U.S. at 774. Information that does not directly reveal the operations or activities of the federal government, "falls outside the ambit of the public interest that the FOIA was enacted to serve." Reporter's Committee, 489 U.S. at 775.

The FOIA public interest in disclosure refers to "open[ing] agency action to the light of public scrutiny," Oguaju v. United States, 288 F.3d 448, 450 (D.C. Cir. 2002), and "it does not include helping an individual obtain information for his personal use." Id. (quoting Mays v. DEA, 234 F.3d 1324, 1327 (D.C. Cir. 2000)), vacated by Oguaju v. United States Marshals

-10-

Service, 541 U.S. 970 (2004), judgment reinstated by Oguaju v. United States, 378 F.3d 1115 (D.C. Cir. 2004), modified 386 F.3d 273 (D.C. Cir. 2004).  For example, courts have consistently refused to recognize any public interest in the disclosure of information solely to assist a prisoner in challenging his conviction.  See, e.g., Neely v. Federal Bureau of Investigation, 208 F.3d 461, 464 (4th Cir. 2000); Hale v. United States Dep't of Justice, 973 F.2d 894, 901 (10th Cir.1992), vacated on other grounds, 509 U.S. 918 (1993); Landano v. Department of Justice, 956 F.2d 422, 430 (3d Cir. 1991), rev'd on other grounds, 508 U.S. 165 (1993).

The Courts have consistently concluded that a request made for purely commercial purposes does not further a public interest.  "FOIA was not intended to require release of otherwise private information to one who intends to use it solely for personal gain."  See Minnis v. United States Dept. of Agriculture, 737 F.2d 784, 787 (9th Cir.1984); O'Kane v. United States Customs Service, 169 F.3d 1308, 1310 (11th Cir. 1999) (requester seeking disclosure of names and addresses of persons subject to Customs seizures in order to solicit them for his law practice; Professional Programs Group v. Department of Commerce, 29 F.3d 1349, 1354 (9th Cir. 1994) (seeking to obtain list of persons registered to take parent bar in order to offer test-prep service); Multnomah County Med. Society v. Scott, 825 F.2d 1410, 1413 (9th Cir. 1987); Aronson v. HUD, 822 F.2d 182, 185-86 (1st Cir. 1987) ("commercial interest does not warrant disclosure of otherwise private information"); Wine Hobby USA, Inc. v. IRS, 502 F.2d 133, 137 (3d Cir. 1974).

### B.  Background Information on the Electronic Databases

When President Abraham Lincoln founded the USDA in 1862, he called it "The People's Department."  See Wieland Dec. at ¶ 25.   In Lincoln's day, the majority of citizens were farmers

or ranchers. Today, farmers and ranchers account for a small percentage of our population, yet the nation's domestic production has more than doubled since the 1930's, when the number of United States farms was at its peak. See id.

FSA is USDA's principal agency charged with promoting a stable and abundant American food supply. See id. at ¶ 26. This objective is best met by supporting America's production agriculture community and helping protect the Nation's food and natural resources. This is achieved through several missions, which include: a) stabilizing farm income; b) helping farmers conserve land and water resources; c) providing credit to new or disadvantaged farmers and ranchers; and, d) helping farm operations recover from the effects of disaster. See id. FSA accomplishes its missions by administering programs that offer financial assistance, either through direct payments, or by offering farm ownership, direct operating, or emergency loans to farmers and ranchers. See id. at ¶ 27. FSA also administers conservation programs that help farmers to protect environmentally sensitive lands or to rehabilitate lands that have been damaged by natural disasters. See id. In addition, FSA provides programs that stabilize farm income for livestock producers and farmers who grow crops. See id.

There are approximately 2.1 million farms in the U.S. today, down from the peak of 7 million in 1935. See id. at ¶ 28. Approximately ninety-eight percent of these farms are family-owned. See id. In order to receive benefits through FSA programs, agricultural producers and farmers submit information about their farming operations to one of the approximately 2,500 county FSA offices. See id. The information collected is maintained in a Privacy Act System of Records, retrievable by name or a personal identifier. Only information necessary for acceptance into one or more of FSA's programs is collected, which is forwarded and stored in several

electronic tabular databases that are located at the KCAO.  See id.  A database is a logical

collection of interrelated information, which is managed and stored as a unit, usually on some

form of mass storage system, such as magnetic tape or disk.  See id.

The twelve electronic, tabular databases referenced in the July 13, 2005, FOIA request

submitted by Multi Ag Media contain the following fields:

a.    State code: a two character Federal Information Processing Standards
("FIPS") code used to identify states.

b.    County code: a three character FIPS code used to identify counties, which
is unique when in combination with appropriate State code.

c.    Customer number: A computer system generated identifier that is unique
to each individual or entity has a record in one of its electronic databases.
A customer number will be assigned to an individual or entity and remains
associated with a particular individual or entity for as long as the record
remains in the database, regardless of the calendar year.  By way of
background, FSA does collect taxpayer identification numbers, as it is the
taxpayer number that FSA uses to issue program subsidy payments.  The
"customer number" is not used by FSA to do business with the customer.

d.    Farm Number: a particular number that is assigned to all land units, which
are under the control of a particular operator.  The farm number is unique
when linked to a given State and county code.

e.    Tract Number: a particular number that is assigned to a collection of land
under the same ownership, unique to a farm number, county code, and
state code.

See id. at ¶ 29.  The fields of state code, county code, customer number, farm number, and tract

number are significant because they allow data from any of the 12 electronic, tabular databases to

be linked or connected with each other, or with the data from the GIS, CLU database.  See id.

The tabular files maintained in the KCAO describe information about individual farmers and

ranchers in general geographic locations, in that information is linked only to a state and county.

-13-

The spatial files of the GIS allow details of individual farmers and ranchers to be linked to a specific geographic location.  See id.

C.    **Livestock Compensation Program (LCP)**

The LCP is an emergency disaster relief program administered by FSA that benefits agricultural producers who own livestock.  The recipients under this program suffered feed and pasture losses due to drought.  See id. at ¶ 30.  Through LCP, FSA provides direct payments to eligible program recipients.  See id.  In response to the initial FOIA request FSA released, in part, more than 1.4 million records from this file.  The information withheld was information that would reveal the number of head of livestock by kind.  See id. at ¶ 31 and Ex. H.

Upon consideration of Multi Ag Media's FOIA appeal, FSA sought to segregate and release from the LCP as much information as permissible under the FOIA.  See id. at ¶ 32.  The LCP File has 44 fields.  On appeal, FSA determined that all the fields except for the field that would reveal the number of livestock by head was proper and no additional information in this file must be disclosed.  See id.  The released information from this electronic file included the names and addresses of payment recipients, and the kind of livestock in which each livestock producer has an interest.  See id.  The only field that FSA withheld from this electronic file was the field that indicates the number of livestock owned by the program recipients.  See id. and Exs. H and O.

The LCP File qualifies as a "similar file" under Exemption 6 because this electronic database pertains almost exclusively to individuals.  See id. at ¶ 33; Washington Post, 456 U.S. at 602; New York Times, 920 F.2d at 1005.  This database contains the names and addresses of livestock owners who received payments under this disaster relief program.  Further, the LCP File

contains the customer number field, which is a unique numeric identifier assigned to an

agricultural producer, in lieu of his or her social security number.  See Wieland Dec. at ¶ 33.

        As to the single field that was withheld from the LCP File, the privacy interests implicated

by the number of head of each kind of livestock owned by program recipients are significant for

several reasons.  The program recipients applied to the LCP in the first instance because they were

experiencing economic distress as a result of natural disasters.  See id. at ¶ 34.  Livestock are

assets that can be pledged as security interests in commercial transactions.  Knowing the number

of head of particular livestock will reveal their economic value, especially given that certain types

of livestock may not be sold in the market place unless they are at a certain weight.  See id.

Further, knowing how many head of livestock that agricultural producers or ranchers own may

reveal their overall financial condition.  See id.  The substantial privacy interest that individuals

have in their financial information is well-established in the law, especially where the information

can be matched to the individual.  See Kleppe, 547 F.2d at 685; Hill v. Department of Agriculture,

77 F. Supp.2d 6, 7-8 (D.D.C. 1999); see also Forest Guardians v. Federal Emergency

Management Agency, 410 F.3d 1214, 1218 (10th Cir. 2005) (citation omitted); Beard v. Espy,

1995 WL 792071 at **1 (9th Cir. Dec. 11, 1995) (citing Rosenfeld v. United States Dept. of

Justice, 57 F.3d 803, 807 (9th Cir.1995)); Aronson v. U.S. Department of Housing and Urban

Development, 822 F.2d 182, 185 (1st Cir.1987) ("the privacy interest becomes more significant,

however, when names and addresses are combined with financial information); Columbia Packing

Co., Inc. v. Department of Agriculture, 417 F. Supp. 651, 654-55 (D. Mass.1976).

        The public interest that would be promoted by disclosing the field at issue would be

minimal at most.  See Wieland Dec. at ¶ 35.  Among the 43 fields that were released in appeal

-15-

were datum revealing amounts that agricultural producers and ranchers lost as a result of natural disasters, and the payment amounts that they received under the LCP.  See id.  Such information, which was disclosed on appeal, does shed light on FSA conduct, which is the touchstone of the "public interest" under FOIA.  See id.; Washington Post Co. v. Department of Agriculture, 943 F. Supp.2d 31, 36 (D.D.C. 1996).  In contrast, providing numbers on the specific numbers, types, and weights of livestock would not educate the public on FSA activities.  See Wieland Dec. at ¶ 35.

Considering the compelling privacy interests of LCP recipients that are implicated by the field containing information on the number of head of livestock, and the minimal public interest that would be advanced by disclosing this field, FSA invoked Exemption 6 to withhold this field in order to prevent clearly unwarranted invasions of privacy on the part of LCP recipients.  See id. at ¶ 36.

**D.    Livestock Assistance Program (LAP)**

The LAP is an emergency, disaster relief program administered by FSA that assists livestock owners who suffered grazing losses due to natural disasters.  See id. at ¶ 37.  To be eligible to participate in LAP, an agricultural producer must be located in a county that experienced at least a 40 percent loss of grazing for at least 3 consecutive months due to damage resulting from drought, hot weather, disease, insect infestation, flood, fire, flood, hurricane, earthquake, or other natural disaster.  See id.  With the direct payments received under LAP, program recipients are in a better position to feed their livestock in the aftermath of a natural disaster.  See id.

-16-

FSA has begun administering many of its farm subsidy programs using web based technology. See id. at ¶ 38. The LAP Program is one of FSA's web based programs; LAP program applications are created and personal information regarding individual livestock operations is collected and compiled directly online. See id. On July 13, 2005, when Multi-Ag Media submitted its FOIA request for certain data from the LAP file, a record layout describing the values in all fields that may be responsive to the request could not be generated. See id. Because the LAP file is web based, it is not a traditional linear file; rather, it is a relational database comprised of numerous tables. On July 13, 2005, the information requested by Multi-Ag Media existed but was not readily accessible in a form that could be released. See id.

In reviewing the FOIA appeal, FSA sought to segregate and release as much information from LAP file as allowable under the FOIA. The LAP File has 63 fields. See id. at ¶ 39 and Ex. X. FSA determined that 56 of these fields should be released to Multi Ag Media on appeal. See id. and Ex. O. On February 15, 2006, FSA concluded that an additional field, which reveals the amounts that program recipients lost due to natural disasters, should also be disclosed. See id. and Ex. Q. Among the 57 fields that FSA determined should be disclosed were fields revealing the names and addresses of program recipients. See id.

FSA concluded that fields revealing the following types of information should be withheld from the LAP File under Exemption 6: a) weight range description; b) number of head; c) number of days fed; d) grazing loss percent; and e) grazing acreage. See id. at ¶ 40.

The LAP File is a "similar file" under Exemption 6 because it contains data that pertains almost exclusively to individuals. Specifically, the LAP File contains names and addresses of program recipients. See id. at ¶ 41. Further, the LAP File contains the customer number field,

-17-

which is a unique numeric identifier assigned to an agricultural producer, in lieu or his or her social security number. See id. With respect to individual livestock producers, the fields that were withheld from the LAP File implicate the following significant privacy interests:

a:      Weight range description: Livestock represents the assets of livestock owners. Knowing the weight of livestock, especially of particular kind will reveal their value, especially considering that under normal non-disaster conditions, livestock are typically marketed once they are at a certain weight. Livestock owners have privacy interests tied to weight range description information about their livestock because such information reveals the economic value of their livestock. This information may shed light on the livestock owners' own financial condition. See id. at ¶ 42.

b.      Number of head: Livestock reflect the assets of livestock owners, and may be pledged as security in commercial transactions. LAP program recipients have privacy interests in this field because knowing how many livestock they own, combined with the weight range of each kind of livestock, reveals the extent of their assets and provide a snapshot of their financial condition. See id.

c.      Number of days fed: This field represents the number of days program recipients were able to feed their livestock, based on the type of pasture available and category of livestock. The privacy interests in this information go to the condition of the pasture and when a particular livestock producer determined when to sell livestock. For instance, if a livestock owner was able to feed his livestock for 45 days or less, such information may reveal the amount and value of feed available to a particular livestock producer. Consequently, the disclosure of this information may affect the economic value of his livestock. See id.

d.      Grazing loss percent: This field represents the percentage of a program recipient's grazing land that was damaged due to a natural disaster. This field of loss is provided to FSA by individual livestock producers. Local weather conditions, pasture type, type of livestock, number of livestock, management decisions, and other operational practices are factors that each individual livestock producer considered in determining the percentage of grazing loss as it applies to his or her operation. It is important to consider that the program recipient has to be located in a county that has experienced at least 40 percent damage to its grazing lands for 3 consecutive months. To know the exact percent of damage to a particular producer's grazing land may shed light on the dire financial circumstances that the producer was facing. Further, knowing the grazing loss percent would reflect the extent of the livestock producer's inability to feed his livestock. This information may diminish the value of his livestock. In light of the foregoing, agricultural

-18-

producers receiving benefits under LAP have significant privacy interests regarding information concerning grazing loss percentage.  See id.

e.  Grazing acreage: This field provides the number of acres of land that a livestock producer has available for his livestock to use for grazing.  Knowing how many acres an agricultural producer have available for grazing will shed light on the value of his land.  In addition, one will be able to determine when a particular livestock producer will run out of "feed" to feed his livestock with the information provided in this field.  Hence, the value of the program recipient's livestock may be affected by information disclosed from this field.  See id.

See id. at ¶ 42.  As envisioned under the FOIA, the public interest that would be promoted by disclosing datum from the fields described above from the LAP File is either non-existent or minimal.  See Wieland Dec. at ¶ 43.  Of course, whether the requester may be able to make use of this information to advance a commercial interest is no part of the Exemption 6 analysis.  See generally Part III.A and authorities cited therein.  FSA determined that the following information should be released in response to the appeal: a) the names and addresses of program recipients; b) the type of livestock owned by program recipients; and, c) the dates of losses incurred by the program recipients.  See id. at ¶ 43 and Ex. O.  FSA later determined that a field revealing the amounts of the program recipient's losses covered by the LAP program should be disclosed to Multi Ag Media.  See id. and Ex. Q.

The fields that are still being withheld from the LAP provide detailed information about the individual livestock operations and assets of the livestock producers who are the program recipients.  See id. at ¶ 43.  Releasing the fields at issue would not educate the public much further on how FSA administers LAP considering that the fields that were released indicate when the losses had occurred and the amount of the losses that were covered.  See id. at ¶ 44.

-19-

The privacy interests of the LAP recipients substantially outweigh the minimal public interest that would be advanced by disclosing the fields at issue from the LAP File.  In  precarious financial situations, many of these producers applied under LAP because they were unable to feed their livestock due to effects of natural disasters.  See id. at ¶ 45.  Releasing the fields at issue would paint a picture of the diminished livestock operations that many program recipients had to endure in the aftermath of natural disasters.  Knowing the exact extent of a rancher's personal financial loss due to the poor quality of livestock would subject him to unwanted attention, embarrassment, and harassment by others.  See id.; see also United States Department of Defense v. Federal Labor Relations Authority, 510 U.S. 487, 502  (1994) (shielding the names and home addresses of agency employees from being released to unions that requested the lists under FOIA); Painting and Drywall Preservation Fund v. Department of Housing and Urban Development, 936 F.2d 1300, 1302 (D.C. Cir. 1991) (names and addresses of employees of public contractors); Reed v. National Labor Relations Board, 927 F.2d 1249, 1251 (D.C. Cir. 1991) (names and addresses of employees eligible to vote); NARFE, 879 F.2d at 879 (list of names and addresses of retired or disabled federal employees); Wine Hobby USA,, 502 F.2d at135.  Due to the minimal public interest in disclosure, releasing information from the fields at issue would cause clearly unwarranted invasions of privacy with respect to LAP recipients.  See Wieland Dec. at ¶ 45.  Therefore, FSA determined that the privacy interests of these livestock producers outweighed the public interest that would be advanced by the disclosure of the information requested from the LAP File.  Releasing the requested information would not educate the public about FSA conduct or performance with respect to the LAP.  See id.

####    E.    Compliance File

The Compliance File is a massive electronic, tabular database that contains the types and number of acres of crops as reported by agricultural producers to FSA.  See Wieland Dec. at ¶ 46. In essence, this electronic file contains information describing crop data at the farm and field level on hundreds of thousands of individual farms in all 50 states and U.S. territories.  See id.  Many of FSA's subsidy and benefit programs require agricultural producers who receive benefits in these programs to annually report to FSA acreage on all crops in which they have an interest.  See id.

The Compliance File has two sub-parts.  One part is the Compliance Detail, which consists of over 19 million records; each record is comprised of 49 fields.  See Wieland Dec. at ¶ 47 and Ex. I.  Of the 49 fields, FSA determined on appeal that only 8 should be withheld.  See id. and Ex. O.  In reviewing the Compliance Detail portion of this electronic file, FSA attempted to segregate and release as much information as allowable under the FOIA.  The 8 fields that have been withheld under the FOIA revealed information on or about agricultural producers': a) irrigation practices; b) number of rows of tobacco and cotton crops; c) number of rows in terms of width for tobacco and cotton crops; d) reported acreage; and e) determined acreage.  See id. at ¶ 47.

The other subpart of the Compliance File is the Compliance Summary, which consists of over 7 million records and has 39 fields of data.  See id. at ¶ 48 and Ex. I.  Of the 39 fields, FSA determined that 15 fields should be withheld in response to the FOIA appeal.  See id. at ¶ 48 and Ex. O.  In considering the appeal, FSA sought to segregate and release as much information as possible from this portion of the Compliance File.  On February 15, 2006, upon further review of the Compliance Summary File, FSA concluded that two fields that reveal the total abandoned

peanut acreage either reported to FSA by individual peanut growers or determined by FSA will

not contain any information.  FSA no longer collects and maintains peanut acreage amounts with

the crop status of "abandoned"; therefore, these fields will not contain any acreage information.

See id. and Ex. Q.

The 15 fields that FSA determined should be withheld from the Compliance Summary

portion would reveal the following information about the farming operations of agricultural

producers whose data is contained in the Compliance File:

> a.      Irrigation practices;
>
> b.      Planted acreage (reported by producer and determined by FSA);
>
> c.      Intended acreage (reported by producer and determined by FSA);
>
> d.      Double program crop acreage (reported by producer and determined by FSA);
>
> e.      failed crop acreage (reported by producer and determined by FSA);
>
> f.      Prevented planted acreage (reported by producer and determined by FSA);
>
> g.      Official acreage and field checked acreage.

Id. at ¶ 49.

For purposes of Exemption 6, the Compliance File is a "similar file" because it contains

various fields that allow datum to be traced to a specific agricultural producer or landowner, who

are almost exclusively individual producers and closely held entities.  See id. at ¶ 50.  The state

code, county code, farm number, tract number, and/or field number are used in conjunction with

each other to identify an agricultural producer or property owner.  See id.[2]  In considering Multi-

---

[2]A tract number is a numeric identifier assigned by the computer to a collection of land
units under the same ownership, unique to a farm number, county code, and state code.  A field

Ag Media's FOIA appeal, FSA determined that the fields withheld from the Compliance File raised the following privacy implications:

Compliance Detail

a.    Irrigation practices:  The field indicating whether an agricultural producer elected to irrigate, that is, artificially water, his crops bears directly on the value of his property.  In some parts of the nation, irrigated farm property is valued several times over non-irrigated farm property.  Information in this field bears directly on the value of the producer's land and the wealth of the producer in general.  Whether a particular crop is irrigated also reveals the production potential of that crop, as crops that are irrigated yield more than crops that are not irrigated.  See id. at ¶ 52.

b.    Number of rows of tobacco or cotton crops: This field reveals the number of rows actually planted to tobacco or cotton at the field level; this value is used to calculate the acres attributed to these crops.  Cotton and tobacco farmers have a privacy interest in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability.  The number also sheds light on the financial condition of the tobacco or cotton producer.  See id.[3]

c.    Number of rows of tobacco or cotton crops (in terms of width):  This field reveals the width of the row planted to tobacco or cotton, in inches; this value is used to calculate the acres attributed to these crops.  Cotton and tobacco farmers have privacy interests in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability.  The number of acres sheds light on the financial condition of the farmer.  See id.

---

number is an identifier given to part of a farm that is separated from the balance of a farm due to permanent boundaries, such as fences, woodlands, or permanent waterways.  See Wieland Dec. at ¶ 51.

    [3]The cultural practice for planting tobacco and cotton is to alternate rows of the crop with strips of idle land.  Alternating rows of land not planted to a crop allows the type of equipment necessary to cultivate and harvest tobacco and cotton to move in the fields without destroying the crops.  The values in the fields described in items (b) through (f) below are used to determine the acreage of the planted crop in particular field, when the field is not planted in what is referred to as a "solid planting pattern."  See Wieland Dec. at ¶ 52.

d. <u>Number of rows of tobacco or cotton (pattern-in)</u>: This field reveals the number of rows of cotton or tobacco that are planted before a row is skipped. This value is used to calculate the acres attributed to these crops. The affected cotton and tobacco farmers have a privacy interest in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability. The number of acres sheds light on the financial condition of the farmer. <u>See</u> <u>id</u>.

e. <u>Number of rows of tobacco or cotton (pattern-out)</u>: This information reveals that number of rows that have not been planted to tobacco or cotton. This value is used to calculate the acres in a field that are not attributed to these crops. The affected cotton and tobacco farmers have a privacy interest in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability. The number of acres sheds light on the financial condition of the farmer. <u>See</u> <u>id</u>.

f. <u>Number Skip Width</u>: This field reveals the width, in inches, of the row area that was skipped between planted rows of tobacco or cotton; this value is used to calculate the acres in a field that are not attributed to these crops. The affected cotton and tobacco farmers have a privacy interest in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability. The number of acres sheds light on the financial condition of the farmer. <u>See</u> <u>id</u>.

g. <u>Reported Acreage</u>: This field represents the acreage of each type of crop that individual agricultural producers reported to FSA, by field. Agricultural producers have privacy interests in this information because it reflects the amount of crops that they own. These crops are assets that producers rely upon for their livelihood. Further, the amount of crops that agricultural producers own may provide a snapshot on their financial circumstances. <u>See</u> <u>id</u>.

h. <u>Determined Acreage</u>: This field represents the acreage determined by FSA after conducting spot checks in certain locations. Agricultural producers have privacy interests in this information because it reflects the amount of crops that they own. These crops are assets that producers rely upon for their livelihood. Further, the amount of crops that agricultural producers own may provide a snapshot on their financial circumstances. <u>See</u> <u>id</u>.

Compliance Summary

a.  Irrigation practices:  The field indicating whether an agricultural producer elected to irrigate, that is, artificially water, his crops bears directly on the value of his property.  In some parts of the nation, irrigated farm property is valued several times over non-irrigated farm property.  Information in this field bears directly on the value of the producer's land, and the wealth of the producer in general.  Whether a particular crop is irrigated also reveals the production potential of that crop, as crops that are irrigated yield more than crops that are not irrigated.  See id.

b.  Planted Acreage and Planted Acreage Determined: These two fields represent the acreage that agricultural producers planted to a given crop and reported to FSA, and the acreage that FSA determined after conducting spot checks in certain locations, respectively.  Agricultural producers have privacy interests in this information because it reflects that amount of crops that they own.  These crops are assets that producers rely upon for their livelihood.  Further, the amount of crops that agricultural producers own may provide a snapshot on their financial circumstances.  See id.

c.  Intended Acreage and Intended Acreage Determined: A "producer" already is planting and harvesting crops.  The "intended acreage" field reflects information reported by the producer to FSA about the amount of acres of a new crop he intends to plant after he finished harvesting the first crop.  The "intended acreage determined" field reflects the acreage amount determined by a spot check conducted by FSA of the producer's reported intended acreage amount.  Crops are assets, which can give a sense of a farmer's economic well being.  The producers whose crop acreage information is shown in the Compliance File have privacy interests in these two fields because they reveal what kind of crop, as all the acres that individual producers intend to plant.  These fields also shed light on the producers financial condition.  See id.

d.  Double Program Crop Acreage (reported) and Double Program Crop Acreage (determined):  These two fields represent situations where producers planted and harvested initially one type of crop; after said crop was finished, the farmer harvested a different type of crop in the same location and in the same crop year.  Producers reported to FSA how many acres of each type of crop that was planted.  On a case by case basis, FSA conducted spot checks to confirm the acreage reports.  The producers in the Compliance File  have privacy interests in these two fields because the information contained therein reveal how many crops they have double cropped, and shed light on their financial condition.  See id.

-25-

e.    <u>Failed Acreage (reported) and Failed Acreage (determined)</u>: These two fields represent the acreage amounts for crops that were planted, but due to a natural disaster, the farmer decides not to harvest.  This amount is reported by the agricultural producer to FSA.  On a case by case basis, FSA performed spot checks to confirm the reported acreage amounts.  The agricultural producers who reported the failed acreage information have a privacy interest in the information because such information goes to the success or failure of their farming operations.  Knowing specifically how many acres of failed crops that they have may diminish the financial value of their farming operations as well.  <u>See</u> <u>id</u>.

f.    <u>Prevented Planted Acreage (reported) and Prevented Planted Acreage (determined)</u>: These two fields represent acreage amounts for crops that were intended to be planted but were not able to be planted by producers due to natural disasters.  Producers reported these amounts to FSA, which in turn conducted spot checks to confirm these amounts on a case by case basis.  Affected agricultural producers have privacy interests in this information because it sheds light on the value of their farming operations, and overall financial condition.

g.    <u>Experimental Acreage (reported) and Experimental Acreage (determined)</u>: These two fields represent acreage amounts for crops that agricultural producers harvested for experimental purposes only.  By way of background, a crop is considered experimental if it is planted for experimental purposes conducted under the direct supervision of a State experiment station or a commercial company.  Producers reported these acreage amounts to FSA, which in turn conducted spot checks to confirm these amounts on a case by case basis.  Affected agricultural producers have privacy interests in this information because it sheds light on the value of their farming operations, and financial condition in general.

h.    <u>Official Acreage</u>: This field reflects the acreage established by FSA as an accurate measurement of a producer's property or farming operation.  The affected agricultural producer listed in the Compliance File has a privacy interested in this information because it reveals information about the size of his or farming operation, and may shed light about his or her overall financial condition.

i.    <u>Field Checked Acreage</u>: This field reveals the amount of acreage contained within a producer's farming operation after it has been measured by FSA for compliance purposes. The affected agricultural producer whose crop acreage is listed in the Compliance File has a privacy interested in this information because it reveals information about the size of his or her

-26-

> farming operation, and may shed light about his or her overall financial condition.

Id. at ¶ 52.

The public interest that would be advanced by disclosing the fields at issue from the Compliance File is nonexistent.  See Wieland Dec. at ¶ 53.  The aforementioned fields provide detailed information about the assets of the individual agricultural producers and farmers who have provided information about their farming operations to FSA.  The information does not, however, explain how FSA performs it functions or administers its programs.  See id.  The Compliance File lacks payment information; therefore, the detailed crop information does not educate the public on how FSA administers its subsidy or benefits programs based on taxpayer monies.  See id.; compare Washington Post, 941 F Supp. at 34 (permitting release where the records would show who received payments  under the Department of Agriculture's cotton price support program).  The fields that FSA concluded should be disclosed from the 2005 Compliance Detail and Summary Files shed light on FSA activities, in that the information does show that FSA provides program benefits to individuals who are actively engaged in producing agricultural products.  See Wieland Dec. at ¶ 53.

Due to the nonexistent public interest and the significant privacy interests posed by the fields at issue, FSA applied Exemption 6 to withhold the aforementioned fields from the 2005 Compliance File in order to prevent clearly unwarranted invasions of privacy of the affected agricultural producers.  See id. at ¶ 54.

**F.      Geographic Information System (GIS), Common Land Unit**

FSA, along with other USDA agencies, is implementing and using GIS and Global Positioning Systems technology.  See id. at ¶ 55; see also Forest Guardians, 410 F.3d at 1216-17 & n.1.  These technologies, combined with aerial photographs and satellite imagery, are helping FSA staff more efficiently measure land features, identify crop types, and establish maps for farm records.  Computer-generated maps interact with databases that store information about land. These advances give local FSA county offices the ability to help producers continue to exercise wise land stewardship; provide quicker, more accurate information for decision-making purposes; and reduce the amount of time a producer must spend working with local USDA staff in order to participate in FSA programs.  See Wieland Dec. at ¶ 55.  GIS is an application software that can manipulate, analyze, and store spatial or geographic referenced data to a specific point on the planet.  FSA's GIS will compute automatically distances and acres using imbedded calculation models.  In the context of FSA's GIS, spatial data is information concerning the location, shape, and relationships of map features, such as fields, roads, fences, barns, feed lots, and other details contained on maps.  See id.

FSA uses its GIS to draw borders around units of land on digitized, aerial photographs. These borders create polygons, the contents of which can be processed by the GIS.  See id. at ¶ 56. Specifically, the GIS can: a) make the borders particular colors; b) calculate the area of a particular polygon, in acres; c) overlay border lines on top of the original aerial photograph; and, d) attach elements of data, such as a field from a tabular database, to a polygon.  See id.  For the purposes of the GIS, a CLU is the smallest unit of land that has the following: a) permanent and

contiguous boundary; b) common land cover and land management; c) common owner; and, d) common producer association. See id. at ¶ 57.

The GIS, CLU database, which in maintained in the Aerial Photograph Field Office and individual FSA State Offices throughout the nation, has 14 attributes and layers. See id. at ¶ 58. In considering Multi Ag Media's FOIA appeal, FSA sought to segregate and disclose as much information as permissible under the FOIA. To this end, FSA determined that the following attributes should be disclosed: a) shape, b) state code, c) county code, d) CLU calculated acres, and e) and the layer pertaining to the Conservation Reserve Program. See id. At a later point in time, FSA determined that the attribute pertaining to Comments should be released. See id. FSA invoked Exemption 6 of the FOIA with respect to the following attributes and layers of the GIS, CLU database: a) farm number; b) tract number; c) CLU number; d) Highly Erodible Land Type Code; and, e) CLU Classification Code; and f) CLU Identifier (CLUID). See id. at ¶ 59.

The GIS, CLU database qualifies for coverage under Exemption 6 because it is a "similar file" for purposes of the exemption. See id. at ¶ 60. This database contains several attributes, such as farm number, tract number, CLU number, and CLU Identifier (CLUID), which will allow datum to be traced to a specific agricultural producer or landowner who are almost exclusively individual producers and closely held businesses. See id. In evaluating Multi Ag Media's FOIA appeal with respect to the GIS, CLU database, FSA considered the privacy interests that would be affected by the appeal against the public interest that would promoted by releasing information from the database. FSA recognized that a tabular database and a GIS spatial database are not similar. See id. at ¶ 61. Although, a tabular, electronic database may provide detailed information about an agricultural producer at a general state and county location, a GIS spatial

-29-

database will provide the same information, but on a digitized photograph or map providing a

specific geographic reference.  See id.  Hence, the privacy interests raised by individual farming

details stored in a tabular database are heightened significantly when related to a GIS database,

due to its spatial component.  See id.[4]

The privacy interests of agricultural producers whose information can be imported into the

GIS are significant with respect to the attributes and layer that FSA determined should be

withheld:

a.    Farm and tract numbers: A farm number is assigned to all land units under
      a particular operator.  A tract number is assigned to all land units under the
      same owner.  Both numbers require a state code and county code in order to
      be unique.  Affected agricultural producers have privacy interests in farm
      and tract numbers, particular in the context of the GIS, because these
      numbers will allow one to locate them (and their property) at a specific
      geographic point on a map or photograph, in relation to other geographic
      points of reference in the area.

b.    CLU Number: FSA assigns this number to individual CLUs. The CLU
      number requires a state code, county code, and tract number to be unique.
      Affected agricultural producers have privacy interests in this number
      because when it is used in conjunction with a farm or tract number, it will
      allow one to locate them (and their property) at a specific geographic point
      on a map or photograph, in relation to other geographic points of reference
      in the area.

c.    Highly Erodible Land Type Code: This attribute indicates whether any
      portion of the agricultural producer's property contains highly erodible
      lands. The general knowledge that an agricultural producer may have highly
      erodible lands on his property may affect the economic value of his
      property.  The GIS would not only allow one to see the composition of that
      producer's property, but that of neighboring properties as well.

d.    CLU Classification Code: This attribute reveals whether an agricultural
      producer's property is urban, barren, or has water or perennial snow cover.

_____

[4]Upon request, FSA will provide sample output from the GIS database to the Court in
camera.

-30-

There are other classifications under this attribute, such as crop land, forest, tundra, and mined land. The attribute raises privacy concerns because knowing what type of land, as well as the total acreage by land classification, a producer owns may shed light on the value of his land. Moreover, the GIS will allow one to view the producer's property, whatever type it is, in relation to other geographic points. This frame of reference can give one a better sense of the financial value of the producer's land.

e.    FSA Official Acres: Prior to FSA developing GIS, aerial photographs were used to record acres at the field level. As FSA began transferring data from the aerial photographs into GIS, the acreage calculated by GIS, in most cases, would not be the same acreage amount shown on FSA records. This attribute represents the FSA acreage from its tabular records that FSA used to reconcile the differences in acreage between FSA's tabular files and the GIS calculated acreage. Affected agricultural producers have privacy interests in this attribute because it reflects information about the size of his or her farming operation at a specific geographic location. GIS will allow one to view the producer's property, in relation to other geographic points. Hence, GIS will reveal how much property is owned by these producers, at a specific geographic location, which may reflect their wealth (or lack thereof).

f.    The Wetland Layer: This attribute indicates whether any portion of the agricultural producer's property contains wetlands and the number of acres determined to be a wetland. The general knowledge that an agricultural producer may have wetlands on his property may affect the economic value of his property. The GIS would allow one to see the soil composition of that producer's property, as well as neighboring properties.

Id. at ¶ 61.

The public interest that would be advanced by releasing the attributes and layers from the GIS, CLU database would be nonexistent because these fields do not reflect FSA conduct or performance. The GIS has the potential to generate photographs and maps that can be layered with data from FSA's tabular databases (and with data from public sources) at specific geographic locations. See id. at ¶ 62. Viewing specific data about producers' livestock or farming operations within a given county on an aerial photograph or map is invasive, especially when the photograph

-31-

or map does not reveal anything about FSA conduct or activities.  See id.  The privacy interests of

the agricultural producers whose information could be imported into the GIS, CLU database are

significant, given the spatial, geographic dimensions of this database.  See id. at ¶ 63.  Due to the

nonexistent public interest, FSA withheld the attributes and layer at issue from the GIS, CLU

database in order to avoid clearly unwarranted invasions of privacy of these agricultural

producers.  See id.

 For these reasons, FSA respectfully submits that it has sustained its burden to justify its

withholdings of information under FOIA Exemption 6.

## V. RECORDS WITHHELD UNDER EXEMPTION 2

### A. Exemption 2

 Under Exemption (b)(2), matters that are "related solely to the internal personnel rules and

practices of an agency," are exempt from disclosure.  See 5 U.S.C. § 552(b)(2).  Courts have

interpreted Exemption 2 to comprise two different categories. The first category covers internal

matters of a relatively trivial nature, or so-called "Low 2" information.  See Department of the Air

Force v. Rose, 425 U.S. 352, 369-79 (1976); Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir.

1992).  Exemption 2 has been construed to permit the withholding of mundane administrative

data such as file numbers, mail routing stamps, data processing notations and other administrative

markings.  See Hale v. Department of Justice, 973 F.2d 894, 902 (10th Cir. 1992); Lesar v. United

States Dep't of Justice, 636 F.2d 472, 485 (D.C. Cir.1980).

**B.        Application of Exemption 2 to the Electronic Databases at Issue**

The GIS, CLU database includes the CLU Identifier (CLUID) attribute.  See Wieland Dec. at ¶ 65.  The CLUID is a globally-unique identifier assigned by the computer to each individual CLU when a CLU is created or changed.  The CLUID is a 36-character string of alpha and numeric characters that is not generally visible or recognizable by the user, but is recognizable by the computer.  See id.  The CLUID provides an internal uniqueness that is needed to maintain electronic records as such records are moved and merged among computers and offices.  The type of information in each CLUID includes date, time, latitude and longitude coordinates, name of the individual computer workstation, and portions of user logins.  See id.  This data is randomly jumbled, unique to the nation, and when the CLU polygon shape changes, the CLUID will change, with the original CLUID character string never used again.  See id.  This information relates solely to the internal workings of the computer and the GIS software and provides the means by which FSA identifies and tracks information in GIS.  See id.

The CLUID relates to the internal practices of the agency in that it is utilized by agency personnel in the performance of their jobs.  See id. at ¶ 66.  Release of the CLUID will enable the user to relate, on a one-to-one basis, certain individual farming details from the tabular database files to a specific point on the earth.  Any data that can be tied to a point on the ground can be related to any other data tied to the same geographic point.  See id.  In addition, release of these internal agency codes located in the GIS database could assist unauthorized users gaining access to the system to navigate the system and thereby delete or alter the information contained therein.  See id.  Such alterations could assist persons in disrupting agency operations or invading the personal privacy of the individuals' farming practices.  The CLUID is internal "computer

language" with no genuine public interest, in that this information does not significantly shed light on FSA's statutory mission or duties or how FSA carries out its responsibilities.  See id.; see generally Founding Church of Scientology v. Smith, 721 F.2d 828, 830 (D.C. Cir.1983); Lesar, 636 F.2d at 485 (informant codes held a matter of internal significance in which the public has no substantial interest [and which] bear no relation to the substantive contents of the records released); Branch v. FBI, 658 F. Supp. 204, 208 (D.D.C.1987) ("There is no question that [source symbol and file numbers are] trivial and may be withheld as a matter of law under Exemption 2.").  Therefore, all CLUID have been withheld pursuant to Exemption 2.

For these reasons, FSA respectfully submits that it has sustained its burden to justify its withholdings of information under FOIA Exemption 2.

## V.    SEGREGABILITY

FOIA requires that if a record contains information that is exempt from disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt information unless the non-exempt portions are "inextricably intertwined with exempt portions." 5 U.S.C. § 552(b); Mead Data Cent., Inc. v. United States Dept. of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).  The agency must provide a "detailed justification" to demonstrate that all reasonably segregable information has been released, Mead Data, 566 F.2d at 261, and show "with reasonable specificity" why a document cannot be further segregated.  Armstrong v. Executive Office of the President, 97 F.3d 575, 578-79 (D.C. Cir.1996).  Further, this Circuit has held that a reviewing court has an obligation to consider segregability sua sponte.  See Trans-Pacific Policing Agreement v. United States Customs Service, 177 F.3d 1022 (D.C. Cir. 1999).

-34-

Here, FSA has met its segregability obligation.  First, the withholding in this case is only a

withholding "in part."  The mere fact that there has been a release in part is shows that the agency

considered whether there exist segregable portions of the requested records that may be released.

Second, as set forth in Parts III and IV, FSA has conducted a field-by-field review of each

requested database to ascertain what could be released and what was required to be withheld from

disclsoure under Exemptions 6 and 2.  See supra Part III and IV (citing Wieland Dec. at ¶¶ 32, 39,

47, 48, 58).  Finally, defendant has included a sworn statement that Multi Ag Media has received

all segregable, non-exempt material pertaining to its request for information pertaining to the

electronic databases at issue and that all remaining information is exempt, and has been fully

described and justified.  See Wieland Dec. at ¶ 67.  On these bases, the Court should conclude

that the agency has met its burden with respect to segregability.

## VI.    CONCLUSION

WHEREFORE, defendant requests that its Motion for Summary Judgment be granted, that

judgment be entered for defendant, and that this matter be dismissed with prejudice.

Respectfully submitted,

_____/s/_____
KENNETH L. WAINSTEIN , D.C. Bar # 451058
United States Attorney

_____/s/_____
R. CRAIG LAWRENCE, D.C. Bar # 171538
Assistant United States Attorney

_____ /s/ _____
PETER D. BLUMBERG, Bar # 463247
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7157

Dated: February 15, 2006

OF COUNSEL:
Karen Carrington
United States Department of Agriculture

-36-