**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MULTI AG MEDIA, LLC, )
                                    )
          Plaintiff, )
                                      )
     vs. )            Civil Action No. 05-1908 (HHK)
                                      )
UNITED STATES DEPARTMENT OF )
AGRICULTURE, FARM SERVICE )
AGENCY, )
                                      )
          Defendant. )
_____ )

## DECLARATION OF ROBIN WIELAND

In accordance with 28 U.S.C. § 1746, I, Robin Wieland, do hereby declare that:

1.       I am a Paralegal Specialist with the United States Department of Agriculture

(USDA), Farm Service Agency (FSA), and I am stationed in Washington, D.C.  I have been

employed with FSA since 1984, as a Program Technician and a Management and Program

Analyst.  I have held the position as Paralegal Specialist with FSA's Appeals and Litigation Staff

since January 2004.

2.       My duties as a Paralegal Specialist include processing and evaluating

administrative appeals filed under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 and

the Privacy Act (PA), 5 U.S.C. § 552a.  I am the FSA employee who evaluated the FOIA appeal

submitted from James D. Miller, Esq., on behalf of Multi Ag Media, LLC ("Multi Ag Media).

3.       I make this declaration based upon the knowledge I have acquired through the

performance of my official duties.

1

## CHRONOLOGY (PROCEDURAL BACKGROUND)

Processing of the Multi Ag Media FOIA Request

4.     On July 13, 2005, Multi Ag Media submitted a FOIA request to the FSA, Kansas

City Administrative Office ("KCAO"), requesting records from FSA electronic, tabular

databases pertaining to twelve listed programs and for the "fully attributed file with digitized

farm field boundaries" including listed specifications for the calendar year 2005. Plaintiff

requested the data on compact disks (CDs) and be forwarded to Damon J. Horst, Multi Ag

Media, LLC, 645 Blackhawk Dr., Westmont, IL.  See Exhibit A.  Specifically, Multi Ag Media

requested copies of 2005 program year information from the following twelve electronic, tabular

databases:

       a.     Participating Producers File,

       b.     Producer Payment Reporting System,

       c.     Producer Type Code File,

       d.     Permitted Entity File,

       e.     Livestock Compensation Program ("LCP"),

       f.     Tobacco Files,

       g.     Compliance File,

       h.     Agricultural Market Transition Act File ("AMTA"),

       i.     Direct and Counter Cyclical Payment Program File ("DCP"),

       j.     Conservation Reserve Program File for Sign Up 26 and later ("CRP"),

2

k.      Actual Production History File ("APH"), and,

l.      Livestock Assistance Program ("LAP").

5.      In addition to the 12 electronic, tabular databases, Multi Ag Media requested a copy of the entire fully attributed Geographic Information System ("GIS"), Common Land Units ("CLU") for the contiguous 48 states. More specifically, the FOIA request sought a copy of a:

> fully attributed file with digitized farm field boundaries, in shape file spatial data format, classified as farm and/or field boundaries, name and address, farm number, field number, tract number, acres, all spatial attributes and coordinates, as well as projection information as attached to these boundaries.

6.      On August 8, 2005, the KCAO FOIA Officer granted Multi Ag Media's FOIA request in part, and denied it in part. The KCAO disclosed the Participating Producer File, the Producer Payment Reporting System, and the Producer Type Code File in full to Multi Ag Media. These electronic records were provided on CD. See Exhibit B.

7.      Containing nearly 3 million records, the Participating Producer File has the names and addresses of agricultural producers and entities that received a payment in at least one program administered by FSA in calendar year 2005. See Exhibit C. Having approximately 22 million records, the Producer Payment Reporting System reveals the payments issued by FSA to agricultural producers and entities in 2005 program year. (Names and addresses of payment recipients are not included in this file). See Exhibit D. Consisting of nearly 30 million records, the Producer Type Code File indicates the status of the agricultural producer or entity as an owner, operator, or tenant of the farming operation. See Exhibit E.

3

8.    In responding to the FOIA request, the KCAO determined that the Permitted Entity, Tobacco, and LCP Files should be released in part. See Exhibits F, G, and H. In addition, the KCAO concluded that the following files should be withheld in full: Compliance File, AMTA File, DCP File, CRP File, and APH File. See Exhibit B.

9.    The KCAO based its determinations that particular electronic, tabular databases should either be released in part, or withheld in full on Exemption 6 of the FOIA, 5 U.S.C. §552(b)(6).

10.    With respect to the LAP File, the KCAO did not make a determination because said file was not available. As for the GIS, CLU database, the KCAO referred this portion of Multi Ag Media' FOIA request to the USDA, Aerial Photography Field Office, in Salt Lake City, Utah. See Exhibit B.

11.    Multi Ag Media submitted a FOIA appeal to FSA on or about August 24, 2005. See Exhibit N.

The Processing of the Multi Ag Media FOIA Appeal

12.    The FOIA appeal submitted by Multi Ag Media was processed by the FSA, Appeals and Litigation Staff, which is based in Washington, D.C. As required by regulation, if FSA determines to deny a FOIA appeal either in part or in full, the Administrator of FSA issues the final determination with respect to FOIA appeals.

13.    On November 23, 2005, FSA granted Multi Ag Media's FOIA appeal in part, and denied it in part. On appeal, FSA issued a final determination with respect to electronic data pertaining to individual farmers and agricultural producers. In response to the appeal, FSA

4

determined that the Tobacco File and the Permitted Entity Files should be disclosed in full. As for the following electronic tabular files, which were withheld in full initially, FSA determined on appeal that they should be provided in redacted form: Compliance File, AMTA, DCP, CRP, and, APH. See Exhibit O.

14.    With respect to the LAP file, which was not available when Multi Ag Media's request was considered initially, FSA concluded that this file should be provided in redacted form on appeal. As for the LCP file, FSA determined that the aforementioned electronic file should continue to be provided in redacted form. Regarding the GIS, CLU database, FSA determined that it should be provided to Multi Ag Media in part.

15.    As for electronic data concerning farming operations that are business entities, FSA did not issue a final determination on Multi Ag Media's FOIA appeal. FSA refrained from issuing a decision concerning electronic data pertaining to business entities because its electronic, tabular databases at the KCAO could not distinguish whether a business entity is a closely held one.

16.    Generally, for the purposes of Exemption 6 of the FOIA, FSA views owners and operators of farming operations that are closely held businesses as being similarly situated as individual farmers and producers. Typically, such businesses are small family farms in which the financial makeup of the businesses mirrors the financial situation of the individual family members. FSA does not apply Exemption 6 to information pertaining to non-closely held businesses as such businesses do not have any privacy interests.

5

17.     The computer database located in KCAO cannot distinguish whether a business entity is closely held. Therefore, FSA has determined that the only way to ascertain which entities are not non-closely held businesses, for the purposes of determining what information is releasable under FOIA, is to conduct a search of non-electronic records maintained in approximately 2,500 FSA county offices. FSA estimates that the cost to conduct such a search to be $1.2 million. See Exhibit P. The process used to determine which business entities are considered non-closely held would be imperfect because employees in each individual FSA county office would make this determination based on their own judgment. Further, due to the nature of FSA programs, virtually all of the databases at issue contain information pertaining to individual producers or closely held entities. FSA believes that the results of such a search would reveal a very small number of businesses, likely no more than two percent.

18.     On February 15, 2006, FSA issued its determination with respect to certain data contained in the LAP File and Compliance File that had been withheld on appeal. FSA determined that additional information from the LAP File should be released. On further review of the fields that comprise each record in the Compliance File, certain data is no longer collected and maintained by FSA; therefore with respect to the Compliance File, certain information does not exist. See Exhibit Q.

Related FOIA Requests Submitted by Multi Ag Media

19.     After FSA resolved the FOIA appeal, it learned that Multi Ag Media submitted FOIA requests to KCAO on October 3, 2005 and October 6, 2005, respectively. The October 3, 2005, FOIA request was logged in as 06-002, and the October 6, 2005, FOIA request

6

was acknowledged as 06-007. See Exhibits R and S.

20. The October 3, 2005, FOIA request (06-002) was nearly identical to the request submitted by Multi Ag Media on July 13, 2005. KCAO processed the October 3, 2005, request partially and provided Multi Ag Media with copies of the 2005 calendar year AMTA File, 2005 calendar year DCP File, and 2005 calendar year APH File in full on October 19, 20 and 25, 2005, and November 8, 2005. See Exhibits T, U, and V.

21. With respect to the October 6, 2005, FOIA request, KCAO processed said request completely. In response to said request, KCAO provided Multi Ag Media with a copy of the CRP file in full on October 19, 2005. See Exhibit W.

22. As a result of the responses of KCAO to the October 3, 2005, and October 6, 2005, FOIA requests submitted by Multi Ag Media, FSA will no longer invoke Exemption 6 of the FOIA to withhold information from the following electronic files for 2005 program year: a) AMTA File, b) DCP File, c) APH File, and d) CRP File.

23. FSA continues to invoke Exemption 6 of the FOIA to withhold information from the following electronic databases: a) LCP File; b) LAP File; c) Compliance File; and d) GIS, CLU Database.

24. In preparing this declaration, FSA has determined that Exemption 2 applies to certain materials sought by the Plaintiff. The withheld information and justification will be fully explained later within this declaration.

7

## APPLICATION OF EXEMPTION 6 OF THE FOIA
## TO THE ELECTRONIC DATABASES AT ISSUE

Background Information

25.     When President Abraham Lincoln founded the USDA in 1862, he called it "The People's Department." In Lincoln's day, the majority of citizens were farmers or ranchers. Today, farmers and ranchers account for a small percentage of our population, yet our domestic production has more than doubled since the 1930's, when the number of U. S. farms was at its peak.

26.     FSA is USDA's principal agency charged with promoting a stable and abundant American food supply. This objective is best met by supporting America's production agriculture community and helping protect the Nation's food and natural resources. This is achieved through several missions, which include: a) stabilizing farm income; b) helping farmers conserve land and water resources; c) providing credit to new or disadvantaged farmers and ranchers; and, d) helping farm operations recover from the effects of disaster.

27.     FSA accomplishes its missions by administering programs that offer financial assistance, either through direct payments, or by offering farm ownership, direct operating, or emergency loans to farmers and ranchers. FSA also administers conservation programs that help farmers to protect environmentally sensitive lands, or to rehabilitate lands that have been damaged by natural disasters. In addition, FSA provides programs that stabilize farm income for livestock producers and farmers who grow crops.

8

28.     There are approximately 2.1 million farms in the U.S. today, down from the peak

of 7 million in 1935.  Approximately ninety-eight percent of these farms are family-owned.  In

order to receive benefits through FSA programs, agricultural producers and farmers submit

information about their farming operations to one of the approximately 2,500 county FSA

offices.  The information collected is maintained in a Privacy Act System of Records, retrievable

by name or a personal identifier.  Only information necessary for acceptance into one or more of

FSA's programs is collected, which is forwarded and stored in several electronic tabular

databases that are located at the KCAO.  A database is a logical collection of interrelated

information, which is managed and stored as a unit, usually on some form of mass storage

system, such as magnetic tape or disk.

29.     The twelve electronic, tabular databases referenced in the July 13, 2005, FOIA

request submitted by Multi Ag Media contain the following fields:

      a.     State code: a two character Federal Information Processing Standards

          ("FIPS") code used to identify states.

      b.     County code: a three character FIPS code used to identify counties, which

          is unique when in combination with appropriate State code.

      c.     Customer number: A computer system generated identifier that is unique

          to each individual or entity that has a record in one of FSA's electronic

          databases.  A customer number will be assigned to an individual or entity

          and remains associated with a particular individual or entity for as long as

          the record remains in the database, regardless of the calendar year.  By

9

way of background, FSA does collect Internal Revenue Service assigned

taxpayer identification numbers, as it is the taxpayer number that FSA

uses to issue program subsidy payments. The "customer number" is not

used by FSA to do business with the customer.

d.    Farm Number: a particular number that is assigned by the computer to all

land units, which are under the control of a particular operator. The farm

number is unique when linked to a given State and county code.

e.    Tract Number: a particular number that is assigned by the computer to a

collection of land under the same ownership, unique to a farm number,

county code, and state code.

The state code, county code, customer number, farm number, and tract number fields are

significant because they allow data from any of the 12 electronic, tabular databases to be linked

or connected with each other, or with the data from the GIS, CLU database. By way of

background, the tabular files maintained in the KCAO describe information about individual

farmers and ranchers in general geographic locations, in that information is linked only to a state

and county. The spatial files of the GIS allow details of individual farmers and ranchers to be

linked to a specific geographic location.

Livestock Compensation Program

30.    The LCP is an emergency, disaster assistance program administered by FSA that

benefits agricultural producers who own livestock. The recipients under this program suffered

feed and pasture losses due to drought. Through LCP, FSA provides direct payments to eligible

10

program recipients.

31.    In response to the initial FOIA request, FSA released, in part, more than 1.4 million records from this file. The information withheld was information that would reveal the number of head of livestock owned by farmers by kind. See Exhibit H.

32.    Upon considering Multi Ag Media's FOIA appeal, FSA sought to segregate and release from the LCP as much information as permissible under the FOIA. The LCP File has 44 fields. On appeal, FSA determined that its decision to release all the fields except for the field that would reveal the number of head of livestock by kind was proper and no additional information in this file must be disclosed. The released information from this electronic file included the names and addresses of payment recipients, and the kind of livestock in which each livestock producer has an interest. The only field that FSA withheld from this electronic file was the field that indicates the number of head of livestock owned by the program recipients. See Exhibits H and O.

33.    As a threshold matter, the LCP File is a "similar file" under Exemption 6 because this electronic database pertains almost exclusively to individuals. This database contains the names and addresses of livestock owners who received payments under this disaster assistance program. Further, the LCP File contains the customer number field, which is a unique numeric identifier assigned to an agricultural producer, in lieu of his or her social security number.

34.    With respect to the only field that was withheld from the LCP File, the privacy interests implicated by the number of head of each kind of livestock owned by program recipients are significant for several reasons. The program recipients applied to the LCP in the first instance

11

because they were experiencing economic distress as a result of natural disasters. Livestock are assets that can be pledged as security interests in commercial transactions. Knowing the number of head of particular livestock will reveal their economic value, especially given that certain types of livestock may not be sold in the market place unless they are at a certain weight. Further, knowing how many head of livestock that agricultural producers or ranchers own may reveal their overall financial condition.

35.    The public interest that would be promoted by disclosing the field at issue would be minimal at most. Among the 43 fields that were released were data revealing amounts that agricultural producers and ranchers lost as a result of natural disasters, and the payment amounts that they received under the LCP. Such information sheds light on FSA conduct.

36.    Considering the compelling privacy interests of LCP recipients that are implicated by the field containing information on the number of head of livestock, and the minimal public interest that would be advanced by disclosing this field, FSA invoked Exemption 6 to withhold this field in order to prevent clearly unwarranted invasions of privacy of the LCP recipients.

Livestock Assistance Program

37.    The LAP is an emergency, disaster assistance program administered by FSA that assists livestock owners who suffered grazing losses due to natural disasters. To be eligible to participate in LAP, an agricultural producer must be located in a county that experienced at least a 40 percent loss of grazing for at least 3 consecutive months due to damage resulting from drought, hot weather, disease, insect infestation, flood, fire, flood, hurricane, earthquake, or other natural disaster. With the direct payments received under LAP, program recipients are in a better

12

position to feed their livestock in the aftermath of a natural disaster.

38.    By way of background, FSA has begun administering many of its farm subsidy programs using web based technology.  The LAP Program is one of FSA's web based programs; LAP program applications are created and personal information regarding individual livestock operations is collected and compiled directly online.  On July 13, 2005, when Multi-Ag Media submitted a FOIA request for certain data from the LAP file, a record layout describing the values in all fields that may be responsive to the request could not be generated.  Because the LAP file is web based, it is not a traditional linear file; rather, it is a relational database comprised of numerous tables.  On July 13, 2005, the information requested by Multi-Ag Media existed but was not readily accessible in a form that can be released.

39.    In reviewing the FOIA appeal, the type of data that is included in the LAP file was reviewed.  FSA sought to segregate and release as much information from LAP file as allowable under the FOIA.  The record layout that shows the type of data included in the LAP database that is responsive to Multi Ag Media's request is made up of 63 fields.  See Exhibit X.  FSA determined that 56 fields should be released to Multi Ag Media on appeal.  See Exhibit O.  On February 15, 2006, FSA concluded that an additional field, which reveals the monetary rate used to calculate LAP benefits, should be disclosed.  See Exhibit Q.  Among the 57 fields that FSA determined should be disclosed were fields revealing the names and addresses of program recipients.

40.    FSA concluded that fields revealing the following types of information should be

13

withheld from the LAP File under Exemption 6: a) weight range description; b) number of head; c) number of days fed; d) grazing loss percent; and e) grazing acreage.

41.     As a threshold matter, the LAP File is a "similar file" under Exemption 6 because it contains data that pertains almost exclusively to individuals.  Specifically, the LAP File contains names and addresses of program recipients.  Further, the LAP File contains the customer number field, which is a unique numeric identifier assigned to an agricultural producer, in lieu or his or her social security number.

42.     With respect to individual livestock producers, the fields that were withheld from the LAP File implicate the following significant privacy interests:

> a.     Weight range description: Livestock represents the assets of livestock
>         owners.  Knowing the weight of an animal, especially of a particular kind,
>         will reveal its value, especially considering that under normal non-disaster
>         conditions, livestock are typically marketed once they are at a certain
>         weight.  Livestock owners have privacy interests tied to weight range
>         description information about their livestock because such information
>         reveals the economic value of their livestock.  This information may shed
>         light on the livestock owners' own financial condition.
>
> b.     Number of head: Livestock reflect the assets of livestock owners, and may
>         be pledged as security in commercial transactions.  LAP program recipients
>         have privacy interests in this field because knowing how many livestock
>         they own, combined with the weight range of each kind of livestock,

14

reveals the extent of their assets and provide a snapshot of their financial condition.

c.    Number of days fed: This field represents the number of days program recipients were able to feed their livestock, based on the type of pasture available and category of livestock. The privacy interests in this information go to the condition of the pasture and when a particular livestock producer determined when to sell livestock. For instance, if a livestock owner was able to feed his livestock for 45 days or less, such information may reveal the amount and value of feed available to a particular livestock producer. Consequently, the disclosure of this information may affect the economic value of his livestock.

d.    Grazing loss percent: This field represents the percentage of a program recipient's grazing land that was damaged due to a natural disaster. This percentage of loss is provided to FSA by individual livestock producers. Local weather conditions, pasture type, type of livestock, number of livestock, management decisions, and other operational practices are factors that each individual livestock producer considered in determining the percentage of grazing loss as it applies to his or her operation. It is important to consider that the program recipient has to be located in a county that has experienced at least 40 percent damage to its grazing lands for 3 consecutive months. To know the exact percent of damage to a

15

particular producer's grazing land may shed light on the dire financial circumstances that the producer was facing. Further, knowing the grazing loss percent would reflect the extent of the livestock producer's inability to feed his livestock. This information may diminish the value of his livestock. In light of the foregoing, agricultural producers receiving benefits under LAP have significant privacy interests regarding information concerning grazing loss percentage.

e.    Grazing acreage: This field provides the number of acres of land that a livestock producer has available for his livestock to use for grazing. Knowing how many acres an agricultural producer have available for grazing will shed light on the value of his land. In addition, one will be able to determine when a particular livestock producer will run out of "feed" to feed his livestock with the information provided in this field. Hence, the value of the program recipient's livestock may be affected by information disclosed from this field.

43.    As envisioned under the FOIA, the public interest that would be promoted by disclosing data from fields as described above from the LAP File would be minimal at best. FSA determined that the following information should be released in response to the appeal: a) the names and addresses of program recipients; b) the type of livestock owned by program recipients; and, c) the dates of losses incurred by the program recipients. See Exhibit O. FSA later determined that information revealing the monetary rate used to calculate LAP benefits should be

16

disclosed to Multi Ag Media.  See Exhibit P.

44.    The fields at issue from the LAP provide detailed information about the individual livestock operations and assets of the livestock producers who are the program recipients. Releasing the fields at issue would not educate the public much further on how FSA administers LAP considering that the fields deemed to be disclosed indicate when the losses had occurred and the amount of the losses that were covered.

45.    Further, the privacy interests of the LAP recipients outweigh the minimal public interest that would be advanced by disclosing the fields at issue from the LAP File.  In precarious financial situations, many of these producers applied under LAP because they were unable to feed their livestock due to effects of natural disasters.  Releasing the fields at issue would paint a picture of the diminished livestock operations that many program recipients had to endure in the aftermath of natural disasters.  Knowing the exact extent of a rancher's personal financial loss due to the poor quality of livestock would subject him to unwanted attention, embarrassment, and harassment by others.  Due to the minimal public interest in disclosure, releasing information from the fields at issue would cause clearly unwarranted invasions of privacy with respect to LAP recipients.  Therefore, FSA determined that the privacy interests of these livestock producers outweighed the public interest that would be advanced by the disclosure of the information requested from the LAP File.  Releasing the requested information would not educate the public about FSA conduct or performance with respect to the LAP.

Compliance File

17

46.     The Compliance File is a massive electronic, tabular database that contains the types and number of acres of crops as reported by agricultural producers to FSA. In essence, this electronic file contains information describing crop data at the farm and field level on hundreds of thousands of individual farms in all 50 states and U.S. territories. By way of background, many of FSA's subsidy and benefit programs require agricultural producers who receive benefits in these programs to annually report to FSA acreage on all crops in which they have an interest.

47.     The Compliance File has two sub-parts. One part is the Compliance Detail, which consists of over 19 million records; each record is comprised of 49 fields. See Exhibit I. Of the 49 fields, FSA determined that only 8 should be withheld on appeal. See Exhibit O. In reviewing the Compliance Detail portion of this electronic file, FSA attempted to segregate and release as much information as allowable under the FOIA. The 8 fields that were withheld under the FOIA revealed information on or about agricultural producers': a) irrigation practices; b) number of rows of tobacco and cotton crops; c) number of rows in terms of width for tobacco and cotton crops; d) reported acreage; and e) determined acreage.

48.     The other subpart of the Compliance File is the Compliance Summary, which consists of over 7 million records and has 39 fields of data. See Exhibit I. Of the 39 fields, FSA determined that 15 fields should be withheld in response to the FOIA appeal. See Exhibit O. In considering the appeal, FSA sought to segregate and release as much information as possible from this portion of the Compliance File. On February 15, 2006, FSA, upon further review of the Compliance Summary File, concluded that two fields that reveal the total abandoned peanut acreage either reported to FSA by individual peanut growers or determined by FSA will not

18

contain any information. By way of background, FSA no longer collects and maintains peanut acreage amounts with the crop status of "abandoned"; therefore, these fields will not contain any acreage information. See Exhibit Q.

49. The 15 fields that FSA determined should be withheld from the Compliance Summary portion would reveal the following information about the farming operations of agricultural producers whose data is contained in the Compliance File:

    a.    Irrigation practices;

    b.    Planted acreage (reported by producer and determined by FSA);

    c.    Intended acreage (reported by producer and determined by FSA);

    d.    Double program crop acreage (reported by producer and determined by FSA);

    e.    failed crop acreage (reported by producer and determined by FSA);

    f.    Prevented planted acreage (reported by producer and determined by FSA);

    g.    Official acreage and field checked acreage.

50. As an initial matter for the purposes of Exemption 6, the Compliance File is a "similar file" because it contains various fields that allow data to be traced to a specific agricultural producer or landowner, who are almost exclusively individual producers and closely held entities. The state code, county code, farm number, tract number, and/or field number are used in conjunction with each other to identify an agricultural producer or property owner.

51. By way of reference, a tract number is a numeric identifier assigned by the

19

computer to a collection of land units under the same ownership, unique to a farm number, county code, and state code. A field number is an identifier given to part of a farm that is separated from the balance of a farm due to permanent boundaries, such as fences, woodlands, or permanent waterways.

52.     In considering the FOIA appeal, FSA determined that the fields withheld from the Compliance File raised the following privacy implications:

Compliance Detail

a.  Irrigation practices: The field indicating whether an agricultural producer elected to irrigate, that is, artificially water, his crops bears directly on the value of his property. In some parts of the nation, irrigated farm property is valued several times over non-irrigated farm property. Information in this field bears directly on the value of the producer's land and the wealth of the producer in general. Whether a particular crop is irrigated also reveals the production potential of that crop, as crops that are irrigated yield more than crops that are not irrigated.

By way of reference, the cultural practice for planting tobacco and cotton is to alternate rows of the crop with strips of idle land. Alternating rows of land not planted to a crop allows the type of equipment necessary to cultivate and harvest tobacco and cotton to move in the fields without destroying the crops. The values in the fields described in items (b) through (f) below are used to determine the acreage of the planted crop in particular field, when the field is not planted in what is referred to as a "solid planting pattern."

20

b.     Number of rows of tobacco or cotton crops: This field reveals the number of rows actually planted to tobacco or cotton at the field level; this value is used to calculate the acres attributed to these crops. Cotton and tobacco farmers have a privacy interest in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability. The number also sheds light on the financial condition of the tobacco or cotton producer.

c.     Number of rows of tobacco or cotton crops (in terms of width): This field reveals the width of the row planted to tobacco or cotton, in inches; this value is used to calculate the acres attributed to these crops; Cotton and tobacco farmers have privacy interests in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability. The number of acres sheds light on the financial condition of the farmer.

d.     Number of rows of tobacco or cotton (pattern-in): This field reveals the number of rows of cotton or tobacco that are planted before a row is skipped. This value is used to calculate the acres attributed to these crops. The affected cotton and tobacco farmers have a privacy interest in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability. The number of acres sheds light on the financial condition of the farmer.

21

e.    Number of rows of tobacco or cotton (pattern-out): This information reveals that number of rows that have not been planted to tobacco or cotton. This value is used to calculate the acres in a field that are not attributed to these crops. The affected cotton and tobacco farmers have a privacy interest in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability. The number of acres sheds light on the financial condition of the farmer.

f.    Number Skip Width: This field reveals the width, in inches, of the row area that was skipped between planted rows of tobacco or cotton; this value is used to calculate the acres in a field that are not attributed to these crops. The affected cotton and tobacco farmers have a privacy interest in this information as it sheds light on the amount of tobacco and cotton in which they have an interest, as well as the potential production capability. The number of acres sheds light on the financial condition of the farmer.

g.    Reported Acreage: This field represents the acreage of each type of crop that individual agricultural producers reported to FSA, by field. Agricultural producers have privacy interests in this information because it reflects the amount of crops that they own. These crops are assets that producers rely upon for their livelihood. Further, the amount of crops that agricultural producers own may provide a snapshot on their financial

22

circumstances.

h.    Determined Acreage:  This field represents the acreage determined by FSA

after conducting spot checks in certain locations.  Agricultural producers

have privacy interests in this information because it reflects the amount of

crops that they own.  These crops are assets that producers rely upon for

their livelihood.  Further, the amount of crops that agricultural producers

own may provide a snapshot on their financial circumstances.

Compliance Summary

a.    Irrigation practices:  The field indicating whether an agricultural producer

elected to irrigate, that is, artificially water, his crops bears directly on the

value of his property.  In some parts of the nation, irrigated farm property is

valued several times over non-irrigated farm property.  Information in this

field bears directly on the value of the producer's land, and the wealth of

the producer in general.  Whether a particular crop is irrigated also reveals

the production potential of that crop, as crops that are irrigated yield more

than crops that are not irrigated.

b.    Planted acreage and Planted Acreage Determined: These two fields

represent the acreage that agricultural producers planted to a given crop and

reported to FSA, and the acreage that FSA determined after conducting

spot checks in certain locations, respectively.  Agricultural producers have

privacy interests in this information because it reflects that amount of crops

23

that they own.  These crops are assets that producers rely upon for their livelihood.  Further, the amount of crops that agricultural producers own may provide a snapshot on their financial circumstances.

c.    Intended Acreage and Intended Acreage Determined: By way of reference, a producer already is planting and harvesting crops.  The "intended acreage" field reflects information reported by the producer to FSA about the amount of acres of a new crop he intends to plant after he finished harvesting the first crop.  The "intended acreage determined" field reflects the acreage amount determined by a spot check conducted by FSA of the producer's reported intended acreage amount.  Crops are assets, which can give a sense of a farmer's economic well being.  The producers whose crop acreage information is shown in the Compliance File have privacy interests in these two fields because they reveal what kind of crop, as all the acres that individual producers intend to plant.  These fields also shed light on the producers financial condition.

d.    Double program crop acreage (reported) and Double program crop acreage (determined): These two fields represent situations where producers planted and harvested initially one type of crop; after said crop was finished, the farmer harvested a different type of crop in the same location and in the same crop year.  Producers reported to FSA how many acres of each type of crop that was planted.  On a case by case basis, FSA

24

conducted spot checks to confirm the acreage reports. The producers in the Compliance File have privacy interests in these two fields because the information contained therein reveal how many crops they have double cropped, and shed light on their financial condition.

e.   Failed acreage (reported) and Failed acreage (determined): These two fields represent the acreage amounts for crops that were planted, but due to a natural disaster, the farmer decides not to harvest. This amount is reported by the agricultural producer to FSA. On a case by case basis, FSA performed spot checks to confirm the reported acreage amounts. The agricultural producers who reported the failed acreage information have a privacy interest in the information because such information goes to the success or failure of their farming operations. Knowing specifically how many acres of failed crops that they have may diminish the financial value of their farming operations as well.

f.   Prevented planted acreage (reported) and prevented planted acreage (determined): These two fields represent acreage amounts for crops that were intended to be planted but were not able to be planted by producers due to natural disasters. Producers reported these amounts to FSA, which in turn conducted spot checks to confirm these amounts on a case by case basis. Affected agricultural producers have privacy interests in this information because it sheds light on the value of their farming operations,

25

and overall financial condition.

g.    Experimental acreage (reported) and experimental acreage (determined):

These two fields represent acreage amounts for crops that agricultural

producers harvested for experimental purposes only.  By way of

background, a crop is considered experimental if it is planted for

experimental purposes conducted under the direct supervision of a State

experiment station or a commercial company.  Producers reported these

acreage amounts to FSA, which in turn conducted spot checks to confirm

these amounts on a case by case basis.  Affected agricultural producers

have privacy interests in this information because it sheds light on the value

of their farming operations, and financial condition in general.

h.    Official acreage: This field reflects the acreage established by FSA as an

accurate measurement of a producer's property or farming operation.  The

affected agricultural producer listed in the Compliance File has a privacy

interested in this information because it reveals information about the size

of his or farming operation, and may shed light about his or her overall

financial condition.

i.    Field checked acreage: This field reveals the amount of acreage contained

within a producer's farming operation after it has been measured by FSA

for compliance purposes. The affected agricultural producer whose crop

acreage is listed in the Compliance File has a privacy interested in this

26

> information because it reveals information about the size of his or her
> farming operation, and may shed light about his or her overall financial
> condition.

53.     The public interest that would be advanced by disclosing the fields at issue from
the Compliance File would be nonexistent. The aforementioned fields provide detailed
information about the assets of the individual agricultural producers and farmers who have
provided information about their farming operations to FSA. The detailed crop information does
not explain how FSA performs it functions or administers its programs. The Compliance File
lacks payment information; therefore, the detailed crop information does not educate the public
on how FSA administers its subsidy or benefits programs based on taxpayer monies. However,
the fields that FSA determined should be disclosed from the 2005 Compliance Detail and
Summary Files shed light on FSA activities, in that the information does show that FSA provides
program benefits to individuals who are actively engaged in producing agricultural products.

54.     Due to the nonexistent public interest and the significant privacy interests posed by
the fields at issue, FSA applied Exemption 6 to withhold the aforementioned fields from the 2005
Compliance File in order to prevent clearly unwarranted invasions of privacy of the affected
agricultural producers.

### Geographic Information System, Common Land Unit

55.     By way of background, FSA, along with other USDA agencies, is implementing
and using GIS and Global Positioning Systems technology. These technologies, combined with
aerial photographs and satellite imagery, are helping FSA staff more efficiently measure land

27

features, identify crop types, and establish maps for farm records. Computer-generated maps interact with databases that store information about land. These advances give local FSA county offices the ability to help producers continue to exercise wise land stewardship; provide quicker, more accurate information for decision-making purposes; and reduce the amount of time a producer must spend working with local USDA staff in order to participate in FSA programs. GIS is an application software that can manipulate, analyze, and store spatial or geographic referenced data to a specific point on the planet. FSA's GIS will compute automatically distances and acres using imbedded calculation models. In the context of FSA's GIS, spatial data is information concerning the location, shape, and relationships of map features, such as fields, roads, fences, barns, feed lots, and other details contained on maps.

56.    FSA uses its GIS to draw borders around units of land on digitized, aerial photographs. These borders create polygons, the contents of which can be processed by the GIS. Specifically, the GIS can: a) make the borders particular colors; b) calculate the area of a particular polygon, in acres; c) overlay border lines on top of the original aerial photograph; and, d) attach elements of data, such as a field from a tabular database, to a polygon.

57.    For the purposes of the GIS, a CLU is the smallest unit of land that has the following: a) permanent and contiguous boundary; b) common land cover and land management; c) common owner; and, d) common producer association.

58.    The GIS, CLU database, which in maintained in the Aerial Photograph Field Office and individual FSA State Offices throughout the nation, has 14 attributes and layers. In considering Multi Ag Media's FOIA appeal, FSA sought to segregate and disclose as much

28

information as permissible under the FOIA. To this end, FSA determined that the following attributes should be disclosed: a) shape, b) state code, c) county code, d) CLU calculated acres, and e) and the layer pertaining to the Conservation Reserve Program. At a later point in time, FSA determined that the attribute pertaining to Comments should be released.

59.     FSA invoked Exemption 6 of the FOIA with respect to the following attributes and layers of the GIS, CLU database: a) farm number; b) tract number; c) CLU number; d) Highly Erodible Land Type Code; and, e) CLU Classification Code; and f) CLU Identifier (CLUID).

60     As an initial matter, the GIS, CLU database qualifies for coverage under Exemption 6 because it is a "similar file" for the purpose of the exemption. This database contains several attributes, such as farm number, tract number, CLU number, and CLU Identifier (CLUID), which will allow datum to be traced to a specific agricultural producer or landowner who are almost exclusively individual producers and closely held businesses.

61.     In evaluating Multi Ag Media's FOIA appeal with respect to the GIS, CLU database, FSA considered the privacy interests that would be affected by the appeal, and the public interest that would promoted by releasing information from the database. FSA determined that a tabular database and a GIS spatial database are not similar. Although, a tabular, electronic database may provide detailed information about an agricultural producer at a general state and county location, a GIS spatial database will provide the same information, but on a digitized photograph or map providing a specific geographic reference. Hence, the privacy interests raised by individual farming details stored in a tabular database are heightened significantly when related to a GIS database, due to its spatial component. The privacy interests of agricultural

29

producers whose information can be imported into the GIS are significant with respect to the attributes and layer that FSA determined should be withheld. Due to the nonexistent public interest and the significant privacy interests posed by the fields at issue, FSA applied Exemption 6 to withhold the aforementioned fields from the GIS database in order to prevent clearly unwarranted invasions of privacy of the affected agricultural producers.:

       a.    Farm and tract numbers: A farm number is assigned to all land units under a particular operator. A tract number is assigned to all land units under the same owner. Both numbers require a state code and county code in order to be unique. Affected agricultural producers have privacy interests in farm and tract numbers, particular in the context of the GIS, because these numbers will allow one to locate them (and their property) at a specific geographic point on a map or photograph, in relation to other geographic points of reference in the area.

       b.    CLU Number: FSA assigns this number to individual CLUs. The CLU number requires a state code, county code, and tract number to be unique. Affected agricultural producers have privacy interests in this number because when it is used in conjunction with a farm or tract number, it will allow one to locate them (and their property) at a specific geographic point on a map or photograph, in relation to other geographic points of reference in the area.

       c.    Highly Erodible Land Type Code: This attribute indicates whether any

portion of the agricultural producer's property contains highly erodible lands. The general knowledge that an agricultural producer may have highly erodible lands on his property may affect the economic value of his property. The GIS would not only allow one to see the composition of that producer's property, but that of neighboring properties as well.

d.   CLU Classification Code: This attribute reveals whether an agricultural producer's property is urban, barren, or has water or perennial snow cover. There are other classifications under this attribute, such as crop land, forest, tundra, and mined land. The attribute raises privacy concerns because knowing what type of land, as well as the total acreage by land classification, a producer owns may shed light on the value of his land. Moreover, the GIS will allow one to view the producer's property, whatever type it is, in relation to other geographic points. This frame of reference can give one a better sense of the financial value of the producer's land.

e.   FSA Official Acres: By way of background, prior to FSA developing GIS, aerial photographs were used to record acres at the field level. As FSA began transferring data from the aerial photographs into GIS, the acreage calculated by GIS, in most cases, would not be the same acreage amount shown on FSA records. This attribute represents the FSA acreage from its tabular records that FSA used to reconcile the differences in acreage

31

between FSA's tabular files and the GIS calculated acreage. Affected

agricultural producers have privacy interests in this attribute because it

reflects information about the size of his or her farming operation at a

specific geographic location. GIS will allow one to view the producer's

property, in relation to other geographic points. Hence, GIS will reveal

how much property is owned by these producers, at a specific geographic

location, which may reflect their wealth (or lack thereof).

f.    The wetland layer:  This attribute indicates whether any portion of the

agricultural producer's property contains wetlands and the number of acres

determined to be a wetland. The general knowledge that an agricultural

producer may have wetlands on his property may affect the economic value

of his property. The GIS would allow one to see the soil composition of

that producer's property, as well as neighboring properties.

62.    The public interest that would be advanced by releasing the attributes and layers

from the GIS, CLU database would be nonexistent because these fields do not reflect FSA

conduct or performance. The GIS has the potential to generate photographs and maps that can be

layered with data from FSA's tabular databases (and with data from public sources) at specific

geographic locations. Viewing specific data about producers' livestock or farming operations

within a given county on an aerial photograph or map is invasive, especially when the photograph

or map does not reveal anything about FSA conduct or activities.

63.    The privacy interests of the agricultural producers whose information could be

32

imported into the GIS, CLU database are significant, given the spatial, geographic dimensions of

this database.  Due to the nonexistent public interest, FSA withheld the attributes and layer at

issue from the GIS, CLU database in order to avoid clearly unwarranted invasions of privacy of

these agricultural producers.

## APPLICATION OF EXEMPTION 2 OF THE FOIA TO THE ELECTRONIC DATABASES AT ISSUE

64      Exemption 2 of the FOIA exempts from mandatory disclosure matters that are

"related solely to the internal personnel rules and practices of an agency."  5 U.S.C. §552(b)(2).

65.     The GIS, CLU database includes the CLU Identifier (CLUID) attribute.  The

CLUID is a globally-unique identifier assigned by the computer to each individual CLU when a

CLU is created or changed.  The CLUID is a 36-character string of alpha and numeric characters

that is not generally visible or recognizable by the user, but is recognizable by the computer.  The

CLUID provides an internal uniqueness that is needed to maintain electronic records as such

records are moved and merged among computers and offices.  The type of information in each

CLUID includes date, time, latitude and longitude coordinates, name of the individual computer

workstation, and portions of user logins.  This data is randomly jumbled, unique to the nation, and

when the CLU polygon shape changes, the CLUID will change, with the original CLUID

character string never used again.  This information relates solely to the internal workings of the

computer and the GIS software and provides the means by which FSA identifies and tracks

information in GIS.

33

66.    The CLUID relates to the internal practices of the agency in that it is to be utilized by agency personnel in the performance of their jobs. Release of the CLUID will enable the user to relate, on a one-to-one basis, certain individual farming details from the tabular database files to a specific point on the earth. Any data that can be tied to a point on the ground can be related to any other data tied to the same geographic point. In addition, release of these internal agency codes located in the GIS database could assist unauthorized users gaining access to the system to navigate the system and thereby delete or alter the information contained therein. Such alterations could assist persons in disrupting agency operations or invading the personal privacy of the individuals' farming practices. The CLUID is internal "computer language" with no genuine public interest, in that this information does not significantly shed light on FSA's statutory mission or duties or how FSA carries out its responsibilities. Therefore, all CLUID have been withheld pursuant to Exemption 2.

67.    Multi Ag Media has received all segregable, non-exempt material pertaining to its

34

request for information pertaining to the electronic databases at issue. All remaining information is exempt, and has been fully described and justified.

I declare under penalty under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed in Washington, D.C., on this __15__ day of February, 2006.

ROBIN WIELAND
Paralegal Specialist
USDA, Farm Service Agency

35