IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Multi Ag Media LLC | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 05-1908 (HKK) |
| | ) | |
| U.S. Department of Agriculture, | ) | |
| | ) | |
| | ) | |
| Defendant. | )) | |
| | ) | |

MEMORANDUM OF POINTS & AUTHORITIES OF
PLAINTIFF MULTI AG MEDIA IN OPPOSITION TO
SUMMARY JUDGMENT

*Summary*

This Freedom of Information Act case involves agency records showing the acreage, crops, soils, and livestock of farms that receive agricultural subsidies and benefits from defendant U.S. Department of Agriculture ("USDA"). USDA, through the Farm Service Agency ("FSA"), collects this information in order to determine eligibility for, and the amount of, federal farm subsidies and benefits that are paid to each

farm. *See, e.g.*, 7 U.S.C. § 7915(c) ("[A]s a condition on the receipt of any benefits . . . the Secretary [of Agriculture] shall require producers on a farm to submit . . . annual acreage reports with respect to all cropland on the farm."); Declaration of Robin Wieland of USDA ("Wieland decl.") at ¶ 28 ("Only information necessary for acceptance into one or more of FSA's programs is collected . . . .").

In other words, these agency records show why USDA gives $x$ dollars to one farm, $y$ dollars to another farm, and $z$ dollars to yet another. Affidavit of John Montandon, President of plaintiff Multi Ag Media ("Montandon Aff.") ¶ 27. In 2005, USDA spent $21.5 billion on these subsidies and benefits. Affidavit of Professor William Nganje ("Nganje Aff.") ¶ 4.

USDA makes no claim that it gives farms any assurance that the information reported to USDA will be kept confidential. *See* Montandon Aff. ¶ 18. Indeed, USDA has for many years released these agency records in full under FOIA. *Id.* at ¶ 15. Now, without any notice or explanation, USDA claims for the first time that the key portions of these records

are exempt from disclosure under FOIA Exemption 6. *Id.* at ¶¶ 15-17.

Exemption 6 allows the withholding of records "the disclosure of which would constitute a clearly unwarranted invasion of ***personal*** privacy." 5 U.S.C. § 552(b)(6) (emphasis added). USDA has the burden to sustain its decision to withhold these agency records, and this Court's review of USDA's decision is de novo. 5 U.S.C. § 552(a)(4)(B) ("[T]he court shall determine the matter de novo, . . . and the burden is on the agency to sustain its action."). To support its decision, USDA submitted a single declaration, which is by a paralegal, Ms. Robin Wieland. Nothing in Ms. Wieland's declaration suggests that she possesses the "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, to permit her to express any reliable opinion on questions of agricultural economics or the finances of farms.

Exemption 6 requires a two-step analysis:

- First, do the agency records at issue implicate the "personal privacy" of any individual? *Hill v. USDA.*, 77 F. Supp. 2d 6

(D.D.C. 1999), *aff'd per curiam*, 2000 WL
520724, at *1 (D.C. Cir. Mar, 7, 2000)
(summary affirmance "substantially for the
reasons stated by the district court").

- Second, if so, the Court must then balance
  that personal privacy interest against the
  public's right to know how USDA is
  spending money on agricultural subsidies
  and benefits. *Washington Post Co. v.
  USDA*, 943 F. Supp. 31 (D.D.C. 1996).

USDA has not carried its burden of sustaining its new decision
to withhold these agency records at either the first or the second
step of the Exemption 6 analysis.

This case, however, also presents another issue, which is
that USDA, both in Ms. Wieland's declaration, and in its
Memorandum of Points & Authorities in support of its motion
for summary judgment, states that it "withdraws its assertion of
Exemption 6 of the FOIA to withhold information from the
following electronic files for 2005 program year data: a)
AMTA File, b) DCP File, c) APH File, and d) CRP File."

USDA's Memorandum of Points & Authorities ("USDA Mem.") at 6; Wieland decl. at ¶¶ 20-22 (files released "in full"). Similarly, Ms. Wieland states that USDA has decided to release the Permitted Entity file "in full," Wieland decl. ¶ 13.  As Mr. Montandon states, however, these files have ***not*** been released in full, despite repeated requests from him and from counsel for Multi Ag Media.  Montandon Aff. ¶¶ 8-9.  USDA has simply not responded to these requests.  *Id.*  Multi Ag Media submits that this Court should direct USDA to release these files forthwith.

For these reasons, Multi Ag Media requests that USDA's motion for summary judgment be denied, and that USDA be ordered to release the agency records at issue here.

*The Agency Records At Issue*

The agency records at issue here are maintained in computerized databases and consist of generic information on each farm that participates in USDA's agricultural subsidy and benefit programs.  5 U.S.C. § 552(f)(2) (FOIA definition of "record" as "any information . . . maintained by an agency in any format, *including an electronic format*") (emphasis added).

The records at issue are as follows:

1. *CRP, AMATA, DCP, and APH Files.* These acronyms stand for, respectively, Conservation Reserve Program, Agricultural Market Transition Act, Direct & Countercyclical Payment, and Actual Production History. USDA states that it withdraws its objection under Exemption 6 to releasing these files "in full." USDA Mem at 6; Wieland decl. at ¶¶ 20-22. The only issue with respect to these files, therefore, is that USDA, as of today (March 6, 2006) has in fact failed to release them, despite repeated requests. Montandon Aff. 9.

2. *Permitted Entity File.* USDA states that it has decided to release this file "in full," Wieland decl. ¶ 13, but as of today USDA has failed to do so, despite repeated requests. Montandon Aff. ¶ 8.

3. *Compliance File.* USDA has failed to release any part of the Compliance File. Montandon Aff. ¶ 10. USDA states, however, that it has released a total of 65 fields[1]

---

[1] In computing, a "field" is part of a data file representing an item of data. For example, in the Compliance file, the reported acreage for a farm is one "field." *See* Wieland decl. ¶ 47.

from this data file. Wieland decl. at ¶ 47-48. In fact,

none of these fields have been released, despite repeated

requests. Montandon Aff.¶ 10. USDA states that it is

withholding a total of 23 fields from this file. Wieland

decl. ¶¶ 47-48. Eight of the withheld fields relate to the

acreage of each farm. Wieland decl. ¶¶ 47, 49.

Withholding these fields is plainly inconsistent with

USDA's withdrawal of its Exemption 6 objection to

releasing the CRP, AMATA, DCP, and APH files, since

those files contain similar acreage information.

Montandon Aff. ¶ 11. USDA offers no explanation of

why it is agreeing to release the acreage information from

one set of files, but withholding it from the Compliance

file.

4. *LCP and LAP Files.* These acronyms stand for

respectively Livestock Compensation Program and

Livestock Assistance Program. USDA is withholding

from these files the data fields that show the number of

head of livestock on a farm, the weight range of the head

of livestock, the days the livestock have been fed, and the

grazing loss and grazing acreage.  Montandon Aff. ¶ 12;
Wieland decl. ¶¶ 30, 37.

5. *Farm Field Common Land Unit*.  USDA states that it will
release the CRP and Comments layers from this database,
Wieland decl. ¶ 58, but despite repeated requests these
layers have not been released.  Montandon Aff. ¶ 13.
USDA is withholding four data fields from this database
(the farm number, the tract number, the Highly Erodible
Land Type code, and the CLU classification code).
Wieland decl. ¶ 59; Montandon Aff. ¶ 13.  USDA states
that it is withholding one field - the CLU identification
number ("CLUID") - under Exemption 2.  Wieland decl.
64; 5 U.S.C § 552(b)(2).  Multi Ag Media, however, did
not intend to request the CLUID, Montandon Aff. ¶ 13,
and therefore it is not at issue here.

The records listed above appear to be all those that are at issue in this
case.  It is apparent that this case would be narrowed greatly if USDA
would simply release all the data files "in full" that it has represented
to this Court that it would.  The number of records where the parties
actually disagree about the application of Exemption 6 is quite small.

*These Records Do Not Implicate The Privacy Interests Of Any Individual*

The threshold question under Exemption 6 is whether the disclosure of the records in question would invade the "personal privacy" of any individual.  USDA concedes that, "[i]n general, neither corporations nor business associations possess protectible privacy interests."  USDA Mem. at 9.  In any event, this proposition of law under Exemption 6 is well-settled.  *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F. 2d 673, 685 n. 44 (D.C. Cir. 1976) ("The sixth exemption has not been extended to protect the privacy interests of businesses or corporations."); *Washington Post Co. v. USDA*, 943 F. Supp. 31, 37 n. 6 (D.D.C. 1996) ("[C]orporations, businesses, and partnerships have no privacy interest *whatsoever* under Exemption 6.") (emphasis added).

A farm that participates in one of USDA's agricultural subsidy or benefit programs is a business.  Montandon Aff. ¶ 23; *Iowa Citizens for Cmty. Improvement v. USDA*, 256 F. Supp. 2d 946 (S.D. Iowa 2002) (rejecting USDA's Exemption 6 claim: "The Dorr family's participation in the federal farm subsidy program **is not a personal matter** but, rather, a professional or business arrangement

9

with the federal government.") (emphasis added).  Thus, a farm that

elects to participate in these programs, at taxpayer expense, has no

privacy interest that is protected by Exemption 6.

Moreover, USDA makes no claim that it offers farms any

assurance of confidentiality for the information those farms submit to

USDA.  *See* Montandon Aff. ¶ 18.  To the contrary, USDA has for

years released all these records.  *Id.* at ¶¶ 15-17.  USDA neither claims

that releasing these records all these years has invaded anyone's

privacy, nor that some change in the law justifies its sudden about-

face.  Indeed, USDA even fails to mention that it has traditionally

released all these records.

Instead, USDA argues that "closely held" farm businesses are

the equivalent of individuals.  That claim is based on a single

statement in Ms. Wieland's declaration: "FSA views owners and

operators of farming operations that are closely held businesses as

being similarly situated to individual farmers and producers.

Typically, such businesses are small family farms in which the

financial makeup of the businesses mirrors the financial situation of

the individual family members."  Wieland decl. ¶ 16.  USDA bears

the burden of proving this proposition.  5 U.S.C. § 552(a)(4)(B) ("[T]he burden is on the agency to sustain its action.").

Ms. Wieland, who states that she is a paralegal, does include any facts in her declaration to supports this statement. She does not describe her training, experience, or education that would permit her to express a reliable opinion on this subject. She offers no definition of the term "closely held."  *Cf. Berreman v. West Publ'g Co.*, 615 N.W. 2d 362, 368 (Minn. Ct. App. 2000) (a company with 200 shareholders or more could be a 'close' corporation).  Mr. Montandon states: "Based on my lifetime of experience in agriculture, the term 'closely held' is not commonly used to describe the ownership of farms, and this term certainly lacks any clear definition in the agricultural context."  Montandon Aff. ¶ 24.

Mr. Montandon also points out that FORBES MAGAZINE, in its annual survey of closely held businesses in 2005, listed Cargill Incorporated as the largest "on our roster of closely held businesses."  *Id.* at ¶ 26.  Cargill, an agribusiness in Minneapolis, has annual revenues of $67 billion, and 115,000 employees.  *Id.*  Under USDA's "closely held" standard, Cargill

would have a protected privacy interest under Exemption 6. *See also* Montandon Aff. ¶ 25 (Armstrong ranch in Texas, which is so large it has its own Zip Code, is owned by a single family). This is plainly inconsistent with the well-settled principle that businesses have no privacy interest that is protected by Exemption 6.

Even if USDA's "closely held" standard made sense and was consistent with the law, USDA still could not carry its burden here, because generic information in a large database about crop, soils, acreage, and livestock does not implicate any privacy interest. *Washington Post*, 943 F. Supp. at 34 (rejecting USDA's Exemption 6 claim:"[I]t is precisely because the list is so large and the information so generic that the individual privacy interests are so small."); *Hill v. USDA*, 77 F. Supp. 2d 6, 9 (D.D.C. 1999) (endorsing *Washington Post's* reasoning on generic information), *aff'd per curiam*, 2000 WL 520724, at *1 (D.C. Cir. Mar. 7, 2000) (summary affirmance "substantially for the reasons stated by the district court").

USDA argues that there is a privacy interest in generic data about acreage, crops, soils, and livestock because, it

12

claims, these data are the equivalent of financial data about the owners of the farm. Again, the sole factual support for this contention is Ms. Wieland's declaration, and once again, she includes nothing in her declaration to show that she is in a position to make this factual assertion reliably. Ms. Wieland goes so far as to claim that data showing "the width, in inches, of the row area that was skipped between planted rows of tobacco or cotton" is, in fact, personal financial data about the farm's owners. Wieland decl. ¶ 52(f). By USDA's argument, *everything* is personal financial data and thus protected under Exemption 6. That, of course, cannot be the law.

Professor Nganje, who holds a doctorate in agricultural economics from the University of Illinois, and who has been on the faculty of North Dakota State University since 1998, explains in his affidavit that:

> It is difficult to reveal critical farm financial information entirely from the crop and acreage data requested by Multi Ag Media. For example, a farm's revenue is subject to market price variability, weather variability, technological changes, disease impacts, etc. Several other

significant economic variables are needed to make an association between acreage, crops, soil type, livestock, etc., and the financial condition of any individual or married farm couple, and these other economic variables generally are not available for specific farms.

Nganje Aff. ¶ 3; *see* Montandon Aff. ¶ 18 ("None of the data covered by my FOIA request is either financial or personal with respect to any individual."); *see also* Montandon Aff. ¶¶ 19-22 (economic and ownership variables preclude any link between acreage, crop, and livestock data and personal financial information).  Thus, the connection USDA seeks to draw, based solely on Ms. Wieland's declaration, between generic farm data and the personal financial information of individuals does not exist, and USDA has failed to carry its burden of sustaining its decision to withhold these records.

For these reasons, farms that participate in USDA's agricultural subsidy and benefit programs have no "personal privacy" interests that are protected under Exemption 6 in the generic acreage, crop, soil, and livestock data that they submit

14

to USDA.  Consequently, the records withheld by USDA
should be released.

*The Public's Interest Supports Release Of These Records*

USDA paid farm businesses approximately $21.5 billion in
2005 under USDA's agricultural subsidy and benefit programs.
Nganje Aff. ¶ 3.  Ms. Wieland admits in her declaration that: "Only
information *necessary* for acceptance into one or more of FSA's
programs is collected . . . ."  Wieland decl. ¶ 28 (emphasis added).  In
other words, these records are collected by USDA to determine
whether a farm is entitled to receive money from USDA and, if so,
how much.  Despite this, Ms. Wieland repeatedly states in her
declaration that the public's interest in these records is "minimal" or
"nonexistent."  *E.g.,* Wieland decl. ¶¶35 ("minimal at most") 43
("minimal at best") 45 ("minimal public interest"), 54 ("nonexistent
public interest"), 61 ("nonexistent public interest").

Surely for $21.5 billion of public money, USDA should admit
that there is *some* public interest.

Professor Nganje and Mr. Montandon both show the substantial
public interest in knowing why USDA gives $x$ dollars to one farm, $y$

dollars to another farm, and $z$ dollars to yet another.  Professor Nganje

states in his affidavit:

> In recent years there have been contentious economic
> debates about fair distribution of farm subsidies, hinging
> on the fact that larger farms that are already wealthy
> receive the greater share of these subsidies [citations
> omitted].
>
> . . . .
>
> The public's interest in farm-level crop, acreage,
> and livestock data is significant in order to analyze
> economic problems relative to effective farm policies,
> assess the economic impacts of crop diseases, analyze
> production efficiency, etc.
>
> . . . .
>
> Farm-level data on acreage, crops, etc. are needed
> to determine eligibility to receive these payments.  With
> vigorous public debate that most of these payments are
> received by wealthy farmers, there is significant public
> interest to access farm data and evaluate efficient subsidy
> programs that will be equally beneficial to larger and
> smaller farmers.

Nganje Aff. ¶¶ 2, 4.

Mr. Montandon states that: "If these data are no longer made

public, there will be no way to know if FSA is complying with the law

in spending the substantial sums that are appropriated by Congress for these programs each year." Montandon Aff. ¶ 27.

With respect to the Compliance file, Ms. Wieland states in her declaration that the public interest in it is "nonexistent." Wieland decl. ¶ 53. Mr. Montandon attaches to his affidavit a chart prepared by the General Accounting Office ("GAO") for testimony to the Senate Finance Committee in June 2004. According to the GAO, this chart, which shows the complex corporate structure of one single-family farm, was prepared based on the Compliance file. Montandon Aff. ¶¶ 21, 24; Exhibit "A." While Ms. Wieland feels the public interest in the Compliance file is "nonexistent," the GAO appears to consider it sufficiently significant for use in congressional testimony.

In addition, Mr. Montandon cites several recent reports on National Public Radio concerning these USDA subsidy and benefit programs. Montandon Aff. ¶¶ 28-30. For example, on July 11, 2005, NPR aired a report on the Conservation Reserve Program and called this program "controversial." *Id.* at 28. The Conservation Reserve Program, of course, is represented by the CRP data file at issue here. *Id.*

For these reasons, the public interest in knowing how USDA spends the substantial sums appropriated for its agricultural subsidy and benefit programs warrants the release of the agency records at issue here.

*Conclusion*

USDA's motion for summary judgment should be denied, and USDA should be directed to release the agency records at issue in this case.

March 6, 2006                                    Respectfully submitted,


_____/s/_____
James Dabney Miller
D.C. Bar No. 294371
King & Spalding LLP
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 626-2902
jmiller@kslaw.com

Counsel for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ———————————————— ) | |
| Multi Ag Media LLC ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.:  05-1908 (HHK) |
| ) | |
| U.S. Department of Agriculture ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ———————————————— ) | |

Multi Ag Media's Statement of Material Facts
As To Which There Is No Genuine Issue
————————————

Pursuant to Local Civil Rule 7(h), and in support of its Opposition to the motion for summary judgment of defendant U.S. Department of Agriculture ("USDA"), plaintiff Multi Ag Media LLC submits the following statement of material facts as to which there is no genuine issue:

1.  On July 13, 2005, Multi Ag Media submitted a Freedom of Information Act ("FOIA") request to the Farm Services Agency ("FSA") of the USDA seeking release of data for 2005 in the electronic databases that FSA maintains in the course of administering various agricultural subsidy and benefit programs. Affidavit of John Montandon ("Montandon Aff. ") ¶ ¶ 6, 27.

2.  In fiscal year ("FY") 2005, FSA paid  $1.9 billion to farms under FSA's Conservation Reserve Program ("CRP").  Affidavit of William Nganje ("Nganje

Aff.") ¶ 4. [1]   One of the data files that Multi Ag Media requested is the 2005 CRP

file, which contains information on the acreage, soil type, and crops for each farm

that receives payments from FSA under the CRP.  Declaration of Robin Wieland

of FSA ("Wieland decl."), Exhibit "W".  CRP is USDA's largest

conservation/environmental program, and more than 35 million acres of land are

enrolled by farms in this program.  Nganje Aff. ¶ 4 & Exhibit  (USDA Budget

summary at page 30).  The data in the CRP file determine the eligibility of each

farm to participate in the CRP and the amount of the payment to which that farm

is entitled.  Montandon Aff. ¶ 27; *see* 7 C.F.R. § 1410.1(e) ("Data furnished by

prospective [CRP] participants will be used to determine eligibility for program

benefits . . . the failure to provide data could result in program benefits being

withheld or denied.").

3.  In FY2005, FSA paid $8 billion to farms under FSA's direct and countercyclical

payment program.   Nganje Aff. ¶ 4.  This amount is scheduled to increase to $9.1

billion in FY2006.  *Id*.   One of the data files that Multi Ag Media requested is the

2005 "DCP" file, which contains data on acreage and crops for the farms that

receive direct and countercyclical payments from FSA.   Wieland decl. Exhibit

"U".  ("DCP" stands for "Direct & Countercyclical Payments.")  Nearly 1.9

million farms were enrolled in the DCP program in 2005.  Nganje Aff. Exhibit

(USDA Budget Summary at page 29).   The data in the DCP file determine the

eligibility of each farm to participate in the DCP program.  Montandon Aff. ¶ 27;

---

[1]   Professor Nganje attaches to his affidavit the relevant portions of the
FY2007 Budget Summary prepared by defendant USDA, which shows the
amounts appropriated and actually spent on the FSA subsidy and benefit
programs covered by Multi Ag Media's FOIA request.

*see* 7 U.S.C. § 7915(c) ("[A]s a condition on the receipt of any benefits [direct and counter-cyclical payments,] . . . the Secretary [of Agriculture] shall require producers on a farm to submit . . . annual acreage reports with respect to all cropland on the farm."), and the amount of the payment to which that farm is entitled, *see* § 7913(c) (providing that the payment yield and acres on each farm shall be used in determining the amount of direct payments); § 7914(e) (same for counter cyclical payments).

4.  In all, in FY2005, FSA paid approximately $21.5 billion to farms under the subsidy and benefit programs covered by Multi Ag Media's FOIA request. Nganje Aff. ¶ 4 and Exhibit (USDA Budget Summary).

5.  Each of the data files requested by Multi Ag Media in its FOIA request contains generic, demographic data on acreage, crops, soil types, yields, and livestock for each farm that receives payments from FSA under these programs.  Montandon Aff. ¶ 18.  FSA collects these data in order to determine each farm's eligibility for a payment and the amount of that payment.  Montandon Aff. ¶ 27; *see, e.g.,* 7 U.S.C. § 7915(c) (quoted above in ¶ 3 of this Statement of Material Facts).  FSA is required by law to collect the acreage, crop, and other data from each farm that seeks a federal payment for the simple reason that acreage, crops, and other similar factors determine a farm's eligibility to receive these payments.  *See* Montandon Aff. ¶ 27.

6.  USDA makes no claim that it has given any assurance to any farm that has furnished data to FSA that are included in the data files requested by Multi Ag Media that the data will not be released to the public.  To the best of the

knowledge of Multi Ag Media, in fact FSA has never given any such assurance to any farm.  Montandon Aff. ¶ 18.

7. There has been a vigorous public debate over FSA's stewardship of the substantial public funds paid to farms under FSA's agricultural subsidy and benefit programs.  Nganje Aff. ¶¶ 2, 4; Montandon Aff. ¶¶ 21, 27-31.  Professor Nganje emphasizes in his affidavit the need for detailed, farm-level data for economic research regarding FSA's programs, Nganje Aff. ¶ 2, and he notes that, "[i]n recent years there have been contentious economic debates about fair distribution of farm subsidies, hinging on the fact that larger farms that are already wealthy receive the greater share of these subsidies."  *Id.* (citations omitted).

8. There is a public interest in determining whether FSA is spending taxpayer money in these programs properly.  Nganje Aff. ¶ 4.  The only means to determine whether FSA is doing its job properly to have the data showing the amounts received by each farm and the acreage, crops, soil types, livestock, etc., claimed by that farm released to the public.  *Id.*  Otherwise, the public is completely in the dark as to why FSA, in spending $21.5 billion, is paying $X$ dollars to one farm, and $Y$ dollars to another, and $Z$ dollars to yet another.  *Id.*; Montandon Aff. ¶ 27.

9. USDA has represented to this Court that the complete and "in full" data files known as the "Permitted Entity," "CRP," "AMATA," DCP," and "APH" files have been released to Multi Ag Media.  Wieland decl. ¶¶ 13, 20-22.  This representation to this Court is incorrect.  Montandon Aff. ¶ 8-10.  In addition, USDA has represented that it has released portions of the Compliance and Farm

Field Common Land Unit data files that, in fact, it has not released. Wieland decl. ¶¶ 47-48, 58; Montandon Aff. ¶¶ 10, 13.

10.  FSA deliberately changed the farm number in the CRP, AMATA, DCP and APH data files as released to a dummy 'farm sequence number,' and it omitted from these files the field numbers, tract numbers, contract numbers, and customer numbers. Montandon Aff. ¶ 9. Without those fields, it is impossible for the public to know the name and location of the farm that owns or farms, or both, the acreage and crops shown in the file. *Id.* Similarly, for any farm that received a certain amount of taxpayer money, it is impossible to know what acreage, crops, soil types, livestock, etc., were claimed by that farm — and consequently impossible to know whether that farm was legally entitled to the money FSA paid it. *Id.* at ¶¶ 18, 27.

11.  Multi Ag Media has repeatedly requested release of the unaltered data files "in full" that FSA has represented to this Court that it has in fact released, but FSA in facthas failed, without explanation, to release the data files. Montandon Aff. ¶¶ 8-10.

12.  For the CRP, AMATA, DCP, and APH files to be unaltered and complete, these files must contain the farm, tract, and field numbers as these numbers appear in the original database as maintained by FSA. Montandon Aff. ¶ 9.

13.  FSA, in response to FOIA requests by Multi Ag Media for 2003 and previous years, has consistently released the farm number, tract number, and field number as these numbers appear in the original database as maintained by FSA. Montandon Aff. ¶¶ 15-17. For example, Mr. Montandon attaches to his affidavit

-5-

as Exhibit "A" the "file layout" for the CRP file that FSA released to the public for 2003. (The "file layout" for a file contained in a database is merely a list of the names of the "fields" for the entry of data into that database. For example, the name of the farm would be a "field" in the CRP file. *Id.* at ¶ 16.) The file layout in Exhibit "A" shows that the CRP file as FSA released it to the public for 2003 contains fields for the farm number, tract number, and field number. *Id.* The file layout in Exhibit "A" was received by Multi Ag Media from FSA. *Id.*

14. Multi Ag Media repeatedly has sought from FSA an explanation of its sudden decision to stop releasing the farm number, tract number, and field number as those numbers appear in the original database as maintained by FSA, but FSA has refused to give any explanation. *Id.* at ¶¶ 15-16.

15. There is an inconsistency in FSA's position with respect to the release of acreage data. Montandon Aff. ¶ 11. Ms. Wieland claims in her declaration that FSA is withdrawing its objection to producing the CRP, AMATA, DCP, and APH data files "in full." Wieland decl. ¶¶ 20-22. Those files all contain acreage data similar to the acreage data in the Compliance file. Montandon Aff. ¶ 11. According to Ms. Wieland, however, FSA is continuing to object to releasing the acreage data in the Compliance file. Wieland decl. ¶¶ 47, 49.

16. A farm that participates in FSA's subsidy and benefit programs is operated as a business. Montandon Aff. ¶ 23.

17. The term "closely held" is not commonly used to describe the ownership of farms, and this phrase has no clear definition in the agricultural context. Montandon Aff. ¶ 24. Mr. Montandon attaches to his affidavit as Exhibit "B" a

chart prepared by the General Accounting Office, using FSA's Compliance file, to show the complex ownership structure of a farm owned by a single family. *Id.*

18.   The Armstrong ranch in Texas is so large it has its own Zip Code and airport, but it is owned by a single family.  Montandon Aff. ¶ 25.

19.   The 2005 survey of closely held businesses by FORBES MAGAZINE showed that the largest closely held business in the United States was Cargill Incorporated, an agribusiness based in Minneapolis, which has annual revenues of $67 billion and 115,000 employees.  Montandon Aff. ¶ 26.

20.   There is no economic association between the acreage, crop, soil type, livestock, etc., data contained in the FSA data files requested by Multi Ag Media and the financial condition of any individual or married spouses living together.  Nganje Aff. ¶ 3; Montandon Aff. ¶¶ 19-22.  For example, the assertion by Ms. Wieland of USDA that data showing the "width, in inches" of the distance between each row of cotton or tobacco "sheds light on the financial condition of the farmer" is not accurate as a matter of agricultural economics.  Wieland decl. ¶ 52(f); Nganje Aff. ¶ 3.  There are too many other economic variables for an association between acreage, crops, soil type, livestock, etc., and the financial condition of any individual or married spouses to be made.  Nganje Aff. ¶ 3; Montandon Aff. ¶¶ 19-22.

21.   With respect to the GIS database, Multi Ag Media did not request the CLU identification number ("CLUID").  Montandon Aff. ¶ 13.  Multi Ag Media did request the farm numbers, field numbers, and tract numbers in the CLU file,

which are separate from the CLUID.  *Id.*; Wieland decl. Exhibit "A" (FOIA request).

22.   In its FY2007 Budget Summary, USDA justified its expenditures on the GIS — which it termed both "crucial" and "vital" – by stating: "The maintenance of modern digitized databases with common land unit information, ***integrated with soils and crop data and other farm records*** and related initiatives, is ***vital*** to the development of more efficient and effective customer services at the [FSA] Service Centers.  This facilitates the ***realization of potential benefits*** from electronic (e)-Government."  Nganje Aff. Exhibit (USDA Budget Summary at p. 33) (emphasis added).  In contrast, Ms. Wieland of FSA stated that the public interest in the data collected in the GIS is "nonexistent."  Wieland decl. at ¶ 61 (GIS data withheld "[d]ue to the nonexistent public interest.").

23.   To the contrary, there is a substantial public interest in the data FSA collects and maintains in the GIS because these data show how FSA is carrying out its statutory responsibilities and whether it is properly determining the payments to be made to farms.  Montandon Aff. ¶¶ 14, 29.  In addition, as Professor Nganje states, there is a substantial research interest in detailed, farm level data.  Nganje Aff. ¶ ("The public's interest in farm-level crop, acreage and livestock data is significant in order to analyze economic problems relative to effective farm policies, assess the economic impacts of crop diseases, analyze production efficiency, etc.").

24.   Ms. Wieland of FSA in her declaration states that FSA has released to Multi Ag Media the CRP layer and the Comments layer of the GIS.   Wieland decl. ¶ 58.

This is incorrect. Although Multi Ag Media has repeatedly requested the release of these layers, FSA has in fact failed to release either of them. Montandon Aff. ¶ 13.

25. Although FSA has released fields from the GIS showing the number of acres, etc, as with the other data files requested by Multi Ag Media, FSA has withheld the farm and tract numbers. Wieland decl. ¶ 59. As with the other data files, the omission of the farm and tract numbers makes the other data files meaningless. *See* Montandon Aff. ¶ 19.

26. FSA asserts that there is a privacy interest that is invaded by, "[v]iewing specific data about producer's livestock or farming operations within a given county on an aerial photograph or map." Wieland decl. ¶ 62. Yet Internet services such as Google Earth use Government-furnished satellite imagery to show, for free, any address, including farms, in the United States, and the Government makes no privacy objection to the release of this satellite imagery. Montandon Aff. ¶ 14. Where a farm elects to receive substantial government monetary subsidies, the owners of that farm have no privacy interest in preventing disclosure of a FSA database of aerial photographs that FSA maintains to monitor eligibility and compliance with FSA regulations. *Id.*

March 6, 2006                            Respectfully submitted,


                              _____/s/_____
                              James D. Miller, D.C. Bar #294371
                              KING & SPALDING LLP
                              1700 Pennsylvania Avenue, NW
                              Washington, D.C.  20006
                              202-737-0500