**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MULTI AG MEDIA, LLC | ) |
| | ) |
|        **Plaintiff,** | ) |
| | ) |
|        v. | )   **Civil Action No. 05-1908 (HHK)** |
| | ) |
| DEPARTMENT OF AGRICULTURE | ) |
| | ) |
|        **Defendant.** | ) |

**DEFENDANT'S REPLY TO PLAINTIFF'S**
**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

As set forth in Multi Ag Media's Supplemental Declaration of John Montandon, some of

the issues raised in Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Pl.

Opp.) have now been resolved between the parties subsequent to the filling of the opposition

memorandum.  Specifically, those data files defendant represented that it would release but had

not yet been received by Multi Ag Media at the time it filed its opposition have now been

received.  See Supplemental Affidavit of John Montandon ("Supp. Montandon Aff.") at ¶ 2,

USDC PACER Dkt. No. 21, 22.

As a consequence, there are only a limited number of data files, or fields within data files,

that remain in dispute in this Freedom of Information Act ("FOIA") case.  See id.  The remaining

data files and fields that the Farm Service Agency ("FSA") continues to withhold from release

under FOIA Exemption 6, 5 U.S.C. 552(b)(6), are ones that reveal information about the

financial condition of individual and family farmers and producers, but do not say anything about

the manner in which FSA administers its subsidy and support programs.  These data files do not

shed light on what the government is "up to"; rather, they only indicate what some 2.1 million

farmers are "up to."  See United States Department of Defense v. Federal Labor Relations

Authority, 510 U.S. 487, 496 (1994) (recognizing that the purpose of FOIA "is not fostered by

disclosure of information about private citizens accumulated in governmental files but that

reveals little or nothing about an agency's own conduct").

Exemption 6 of the FOIA permits an agency to withhold "personnel and medical and

similar files the disclosure of which would constitute an unwarranted invasion of personal

privacy."  5 U.S.C. § 552(b)(6).   Exemption 6 cases "require a balancing of the individual's right

of privacy against the preservation of the basic purpose of [FOIA] to open agency action to the

light of public scrutiny."  Department of Air Force v. Rose,  425 U.S. 352, 372 (1976).  FSA

does not disagree that for the large majority of the information sought by Multi Ag Media

through its FOIA request this balance tips in favor of public release.  For this reason, FSA has

released whole databases and large portions of other databases to Multi Ag Media.  See generally

Declaration of Robin Wieland ("Wieland Dec.") (discussing the databases released in full and in

part).  However, for the limited information that remains contested in this lawsuit, FSA maintains

that the balance between individual privacy and public interest falls decidedly in the other

direction, calling for withholding under Exemption 6.   Indeed, as explained below in Part II.B.,

defendant believes that it is precisely because the withheld data says so much about individual

farmers that this information is particularly attractive to a commercial requester like Multi Ag

Media.  See Affidavit of John L. Montandon ("Montandon Aff.") at ¶ 1 (acknowledging that

Multi Ag Media, LLC is a vendor to the agricultural community of information on the farming

landscape).

## II. ARGUMENT

### I.    Individuals and Families Have a Protectable Privacy Interest In Information Provided to the Government That Sheds Light on Their Financial Condition

1    Individuals and Families Acting in an Entrepreneurial Capacity Do Have A Privacy Interest in Financial Information About Themselves

Multi Ag Media asserts that because farms owned and operated by individuals or families are commercial enterprises, the individuals and families cede any privacy interests in information related to the finances of the farms. See Pl. Opp. at 6-7. Decisional law from this Circuit indicates that precisely the opposite is true. In National Parks and Conservation Association v. Kleppe, 547 F.2d 673 (D.C. Cir. 1976), the Court of Appeals reviewed a claim that financial information about National Park Service concessioners should be exempt from disclosure under FOIA Exemption 4 (trade secrets and confidential commercial information). In evaluating this argument, the Court of Appeals stated, "[a]ssuming arguendo that some of these concessioners were individually-owned business so that their financial records would necessarily reveal at least a portion of the owner's personal finances . . ." Id. at 685 (emphasis added). The decision went on to decline to read a personal privacy element into Exemption 4, see id. at 685-66, but the salient point is that the D.C. Circuit has recognized that for an individually owned business, financial information about the business is the equivalent of financial information about the individual, the latter of which is indisputably protectable under FOIA Exemption 6. See Lepelletier v. FDIC, 164 F.3d 37, 47 (D.C. Cir. 1999). The Court of Appeals has also expressed "particular[] concern[] when the information may be used for solicitation purposes," which is indisputably the case here. Id.[1]; see also Montandon

_____

[1]Citing Painting and Drywall Work Preservation Fund, 936 F.2d 1300,1303 (D.C. Cir. 1991) ("[T]he workers would experience a significant diminution in their expectations of privacy

3

Aff. at ¶ 1 (acknowledging that Multi Ag Media is a vendor of information to the agricultural community).

Moreover, the majority of other courts to have considered the question have concluded that where individuals are acting in a business or entrepreneurial capacity and, as a consequence, individual and business financial information are essentially one in the same, the individual has an interest in not having that information made available to the public at large. "An overly technical distinction between individuals acting in a purely private capacity and those acting in an entrepreneurial capacity fails to serve the exemption's purpose of protecting the privacy of individuals." Campaign for Family Farms v. Glickman, 200 F.3d 1180, 1189 (8th Cir. 2000) (citing Kleppe for the proposition that "financial records of individually-owned businesses are subject to balancing test of personal privacy exemption"). See also Beard v. Espy, No. 94-16748, 1995 WL 792071 at *1 (9th Cir. Dec. 11, 1995) (where corporation has just two stockholders, disclosure of financial information about the corporation would reveal financial information about individuals); Doe v. Veneman, 230 F. Supp.2d 739, 748-51 (W.D. Tex 2002), aff'd in part, rev'd in part, 380 F.3d 807 (5th Cir. 2004); Providence Journal Co. v. FBI, 460 F. Supp. 778, 785 (D.R.I. 1978) (citing Kleppe), rev'd on other grounds, 602 F.2d 1010 (1st Cir. 1979).

The principal case that Multi Ag Media cites in support of the proposition that a family farm has no privacy interest once it elects to participate in an FSA program, Iowa Citizens for Community

---

because that same information would also have to be provided, for example, to creditors, salesmen, and union organizers. The dissemination of this sort of information about private citizens 'is not what the framers of the FOIA had in mind.'") (citation omitted); NARFE v. Horner, 879 F.2d 873, 876 (D.C. Cir. 1989) ("'When it becomes a matter of public knowledge that someone is owed a substantial sum of money, that individual may become the target for those who would like to secure a share of that sum by means scrupulous or otherwise.'") (quoting Aronson v. HUD, 822 F.2d 182, 186 (1st Cir.1987)).

Improvement v. Dep't of Agriculture, 256 F. Supp.2d 946, 954 (S.D. Iowa 2002) is both readily distinguishable on its facts and, upon close examination, largely consistent with the position taken by FSA here.  In Iowa Citizens, the FOIA requester sought the release of a tape recording and a letter in which a nominee for a USDA undersecretary position allegedly received improper farm subsidy benefits.  See id.  Suffice it to say that an audiotape and communications evidencing wrongdoing by a single individual is a far cry from the request for acreage and farm information concerning over 1 million farmers at issue here.  The court's declining to find a privacy interest in the information requested in Iowa Citizens turned on several considerations not present here, including that fact that "official wrongdoing deprives an individual of the full privacy protection which might otherwise be afforded under FOIA exemptions protecting personal privacy," id. at 955-56, and that the individual in the Iowa Citizens case had specifically discussed the audiotape contents during the course of his confirmation hearings.  See id. at 955 ("[t]hus, his expectation of privacy with regard to the audiotape has been substantially diminished, if not eliminated entirely, by his own public disclosure").

Further, when considering Iowa Citizens – as well as Washington Post v. Department of Agriculture, 943 F. Supp.2d 31 (D.D.C. 1996) and Hill v. Department of Agriculture, 77 F. Supp.2d 6 (D.D.C. 1999) – one cannot lose sight of the fact that FSA has released copious information related to subsidy benefits received by individual and family farmers.  Indeed, as set forth in the Wieland Declaration, FSA has carefully reviewed each and every field in the twelve electronic databases, and where that field would reveal how the various farm subsidy programs are administered, or that would show how much subsidy was actually received by a farmer, that field has been released in response to Multi-Ag Media's FOIA request.  See, e.g., Wieland Dec. at ¶¶ 7, 8, 13; compare Washington

Post, 943 F. Supp. at 35-36 (directing the release of information showing the amounts of subsidy received by cotton farmers).  All that FSA is continuing to withhold here is select information provided to the government by individual and family farmers that would reveal nothing about FSA operations, and that only sheds light on the holdings, and thus the financial condition, of the individual farmer.  See, e.g., Wieland Dec. at ¶¶ 25-63; Supplemental Declaration of Robin Wieland ("Supp. Wieland Dec.") at ¶ 11, 18 (explaining that FSA collects some information from individuals and business entities that do not participate in, or receive subsidy payments from, an FSA program) (Reply Exhibit 1); Hill, 77 F. Supp.2d at 8 (where information was "sufficiently personalized" it was segregable and properly withheld under Exemption 6).

FSA's assertion of Exemption 6 is entirely consistent with the Supreme Court's pronouncement that:

> Official information that sheds light on an agency's performance of its statutory duty falls squarely within that statutory purpose.  That purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct.

Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 773 (1989) (quoting Department of the Air Force v. Rose, 425 U.S. 352, 360-361 (1976)) (other internal quotation marks and citations omitted).  Here, where information "sheds light" on FSA's subsidy program, it has been released.  But where the data fields consist of nothing more than acreage and livestock data that only "sheds light" on the submitter's financial condition, that information should not be released for general public consumption.

2.    FSA is Not Required to Provide Expert Testimony to Make Its Exemption 6 Showing

None of the judicial determinations cited above that individuals or families acting in an

6

entrepreneurial capacity have a privacy interest in financial information about their businesses necessitated the submission of expert testimony from the agency making the Exemption 6 claim. See supra Part II.A.1.  In its opposition memorandum, Multi Ag Media challenges the agency's Exemption 6 assertion on the basis that the FOIA declarant, Robin Wieland, is a paralegal who is allegedly not qualified to opine on agricultural economics or the finances of farms.  See Pl. Opp. at 3, 11, 13.  Multi Ag's challenge suffers from not just one, but several fatal flaws.

First, it is both a common and well-accepted practice to have the declarant in a FOIA case be an agency official with knowledge of the documents, rather than requiring the agency to get declarations from operational employees.  For example, in Scherker v. United States Department of Justice, 217 F. Supp.2d 29, 35 (D.D.C. 2002), aff'd, 349 F.3d 657 (D.C. Cir. 2003), this Court rejected a challenge to an affidavit executed by a FOIA official because the affiant was "responsible for the FBI's compliance with FOIA litigation and is therefore not merely speculating about the FBI's activities."  See also Cucci v. DEA, 871 F. Supp. 508, 513 (D.D.C. 1994) (citing Londrigan v. FBI, 670 F.2d 1164, 1174 (D.C. Cir.1981)); Laborer's Union Int'l v. Department of Justice, 578 F. Supp. 52, 55-56 (D.D.C. 1983), aff'd, 772 F.2d 919 (D.C. Cir.1984). Here, Ms. Wieland's declaration explains that she is the individual who evaluated the Multi Ag Media FOIA appeal, and also states that she has been with FSA for over twenty years as both a Program Technician and a Management and Program Analyst.  See Wieland Dec. at ¶ 1-2.  She is both competent and qualified to provide the evidentiary support for FSA's FOIA withholding decisions.  See id.; see also Supp Wieland Dec. at ¶¶ 2-5 (providing further detail on Ms. Wieland's background, including her experience in the county offices where the type of information sought by plaintiff is first collected by FSA).

Second, Multi Ag Media is seeking to require expert testimony in an area where none is needed. Rule 702 of the Federal Rules of Evidence provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. See also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151 (1999). That making public the financial condition of an individually or family owned business would reveal something about the financial condition of the individual or family is a matter that is "within the common knowledge of the [trier of fact]," and therefore not a suitable topic for expert testimony. United States v. Boney, 977 F.2d 624, 628 (D.C. Cir. 1992); see also Wright & Miller, Federal Prac. & Proc. § 6264 (Rule 702) ("...expert testimony does not assist where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perception or simple logic."). Again, those other courts to consider whether there is a cognizable privacy interest in the finances of an individually-owned business have been able to reach their conclusion based on common sense and common experience, and there is no basis for FSA to have to retain an expert on "agricultural economics" to make the necessary showing of a privacy interest.

Finally, Multi-Ag Media's retention of a professor from the University of Illinois does not materially advance its challenge to defendant's claim of a privacy interest. The carefully crafted language used by Dr. William Nganje is quite telling. He states that "[i]t is difficult to reveal critical farm's financial information [sic] entirely from the crop and acreage data requested by Multi Ag Media." Affidavit of Dr. William E. Nganje ("Nganje Aff.") at 4 (emphasis added). He goes on to

state that other "economic variables" factor into the financial condition of an individual or married farm couple, such as market price variability, weather, technological changes and disease impacts. See id.; see also Montandon Aff. at ¶ 19. Yet FSA does not contend that the information it is withholding tells one with certainty exactly what the financial condition of the individual owner is. Rather, it is FSA's contention that farm acreage, crop information and livestock holdings are among the factors that one would consider to evaluate the financial condition of a farm (and, in turn, the financial condition of the farm's owner). While Dr. Nganje (and Mr. Montandon) posits that there are other variables, he never disputes that acreage, number and type of livestock are among the variables that would reveal the owner's financial condition. See generally Nganje Aff. Given that it remains undisputed that release of the information remaining at issue in this case would reveal something about the financial condition of that farm, the individual farmers have at least some privacy interest in not having that information made available to the general public. When that privacy interest is weighed against the fact that the databases and fields that have not yet been released say nothing about what the government is "up to," see infra Part II.B, the basis for sustaining FSA's invocation of Exemption 6 becomes clear. See NARFE, 879 F.2d at 879 ("something, even a modest privacy interest, outweighs nothing ... every time.").

  3. Plaintiff's Assertions That Some Farms Are Corporate Operations

  In its effort to undercut defendant's showing of a privacy interest, Multi Ag Media seizes upon Ms. Wieland's use of the term "closely held" in her declaration, asserting that there are certain businesses such as Cargill Incorporated that technically qualify as closely held corporations even though they have substantial annual revenues, large numbers of employees, and are essentially large businesses. See Pl. Opp. at 11-12 (citing Montandon Aff. at ¶¶ 25-26); see also Montandon Aff.

9

at ¶ 21. Of course, the plural of "anecdote" is not "data." The fact that Multi Ag Media is able to come up with select examples of large agribusinesses is not a basis upon which to sweep away the privacy interests of nearly 2 million of the nation's small farmers. Importantly, neither Mr. Montandon nor Professor Nganje challenge in any manner FSA's statement that over 98% of the nation's 2.1 million farms are family owned. See Wieland Dec. at ¶ 28; see also id. at ¶ 17.[2]

The Wieland Declaration readily acknowledges that at least some of the farming operations in its databases are non-individual/non-family ("corporate") farms. See Wieland Dec. at ¶ 17. Since the computer database as it currently exists cannot distinguish between individual/family farms and major agricultural companies, the only means by which FSA could sort out the small number of Cargills and Armstrong Ranches is to conduct a search of non-electronic records maintained in about 2,500 FSA county offices across the nation at an estimated cost of $1.2 million. See id. at Exhibit P thereto. Short of Multi Ag Media's agreement to pay this search expense, requiring FSA to attempt to pull needles out of haystacks goes well beyond the requirement of a reasonable search for responsive records, which is what the FOIA requires. See, e.g., Valencia-Lucena v. United States Coast Guard, 180 F.3d 321, 325-26 (D.C. Cir. 1999); Campbell v. Department of Justice, 164 F.3d 20, 27 (D.C. Cir. 1998); Oglesby v. Department of the Army, 920 F.2d 57, 68 (D.C. Cir. 1990); Truitt v. Department of State, 897 F.2d 540, 542 (D.C. Cir. 1990).

---

[2]The 98% figure may also be found in the Department of Agriculture's "Quick Facts About USDA" brochure. See Reply Exhibit 2. The most recent statistical analysis from the National Agricultural Statistics Service indicates that the total is closer to 96 %. See National Agricultural Statistics Service Census, Summary by Type of Organization (2002) (adding the columns for "Individual or Family," "Corporation Family Held" and "Corporation Family Held Less Than 10 Stockholders"), Reply Exhibit 3.

4.      The Fact that FSA Has Released Some Acreage Data Does Not Mean That All
        <u>Acreage Data Need Be Released</u>

In his Supplemental Affidavit, Mr. Montandon specifically addresses eight of the data fields

from the Compliance File that FSA in continuing to withhold under Exemption 6.  <u>See</u> Supp.

Montandon Aff. at ¶ 4-5.  In the initial Declaration of Robin Wieland included with defendant's

Motion for Summary Judgment, FSA explained in considerable detail the contents of each of these

fields and the farmers' privacy interest in not having this information released to the general public.

<u>See</u> Wieland Dec. at ¶ 52, 53.[3]  Mr. Montandon asserts that the acreage information contained in

these eight data fields should be released because FSA has already provided some acreage

information through releases from other databases.  <u>See</u> Supp. Montandon Aff. at ¶ 7.  For example,

Multi Ag Media claims to have complete crop and acreage data on 22.4% of the total farms in the

Compliance File (292,081 farms) and partial data on another 28.2% (367,944 farms) through FSA's

release of the Conservation Reserve Program ("CRP") and Agricultural Market Transition Act

("AMTA") files.  <u>See</u> <u>id</u>. at ¶¶ 8, 9, 10.  Multi Ag Media contends that there is no real difference

between those farms for which they have received crop and acreage data, and those farms for which

they have incomplete or no data.  <u>See</u> <u>id</u>. at ¶¶ 7 ("There is no meaningful distinction between the

two groups of farms") 9, 13.

Multi Ag's claim appears to stem from a misunderstanding of the different types of

information contained in different databases.  FSA is not treating the acreage figures differently

_____

[3]By way of example, Multi Ag Media challenges FSA's withholding data related to the
width, in inches, of the areas that were skipped when planting tobacco and cotton.  <u>See</u> Pl. Opp.
at 13.  The Wieland Declaration, however, explains that the width of the rows indicates how
much tobacco and cotton is actually planted on a given acreage, which, in turn, reveals the
amount of tobacco and cotton in which the farmer has an interest as well as production capacity.
This reflects upon the finances of the farm and the farmer  <u>See</u> Wieland Dec. at ¶ 52(c).

11

because there are "two groups of farms" rather, there are different types of <u>data</u>.  <u>See</u> Supp. Wieland

Dec. at ¶¶ 16-17 ("The type of farm data maintained in each of the files that is at issue in Multi Ag

Media's FOIA request is distinctly different").  To understand this distinction, it is first important

to recognize that FSA collects the names, addresses and details about farming operations from

individuals and business entities that do not participate in, or receive subsidy payments from, an FSA

program.  <u>See</u> Supp. Wieland Dec. at ¶ 11.  These individuals and entities may be the landowner of

a tract or the operator or other tenant on a farm and therefore will be included in the master name

and address files, but will not be included in the more specific FSA program files, such as the CRP

contract, AMTA tract, or Direct and Counter Cyclical Payment Program ("DCP") files.  <u>See</u> <u>id</u>.

The Compliance File (the subject of Mr. Montandon's supplemental declaration) is one of

those files where the crop and acreage information maintained by the government is independent of

any specific FSA program.  <u>See</u> Supp. Wieland Dec. at ¶ 18.  The Compliance File includes the

overall size of a farm and the actual acres planted by crop and field number in a given year, without

a direct linkage between that acreage and the receipt of government funds under a specific program.

<u>See</u> Wieland Dec. at ¶ 52; Supp. Wieland Dec. at ¶ 18.  The information maintained in this file

includes all crops, by field, that individuals and entities planted on a farm and in which they have

an ownership interest.  <u>See</u> Supp. Wieland Dec. at ¶ 18.   This is information that farmers are

required to submit in order to participate in one of the subsidy programs, whether or not that acreage

is actually enrolled in one of those programs.  <u>See</u> Wieland Dec. at ¶ 46; Supp. Wieland Dec. at ¶

11, 18, 20.  Thus, the data maintained in the Compliance File is not reflective of how FSA

administers its support and subsidy programs.

In contrast, the acreage information that has been released from other databases is

information that does indicate subsidies received and thus is reflective of government operations. For example, the Conservation Reserve Program (CRP) is a voluntary program that requires participating landowners to take their croplands out of production for between 10 and 15 years. Producers who have acres enrolled in CRP agree to plant such acreage to a vegetative cover (planted vegetation which protects the land), which improves water quality, controls soil and water erosion, and enhances wildlife habitat.  See Supp. Wieland Dec. at ¶ 17a.  The acreage in this file includes only those acres, by farm, that have been enrolled in this conservation program.  See id.  Since these acreage amounts directly reflect payments from the government, this information has been released to Multi Ag Media, because the public interest in knowing what acres are enrolled in a specific program outweigh the farmer's privacy interests.  See also id. at ¶ 20 (the CRP file reflects only that land on a farm devoted to CRP).

Similar to the CRP data is the Agricultural Market Transition Act (AMTA) data that was released to Multi Ag Media in response to plaintiff's FOIA request.  AMTA is a contract program providing income support to landowners and agricultural producers for crop years 1996 to 2002 for certain crops eligible to participate in AMTA.  See Supp. Wieland Dec. at ¶ 17b.  These acreage figures are not reflective of the farm's entire acreage, but rather the contract acreage for certain commodities enrolled in the FSA program.  See id.  Moreover, the acreage amounts released with the AMTA data are historical averages of planting history over a specific time period, rather than actual acreages, which also distinguishes the released AMTA data from the withheld Compliance File information.  See id.  The DCP program was the successor to the AMTA program; thus, the crop base acreage information contained in this file was released for essentially the same reasons as the AMTA data.  See id. at ¶ 17(c).

Thus, there are significant differences between the Compliance File acreages and the acreages from the other databases that explains why the former are being withheld under Exemption 6 and the latter were released.  As the Compliance File is independent of any specific FSA program, all that it reveals is overall crop and acreage information, <u>regardless</u> of whether those crops and acreages are enrolled in one of FSA's subsidy programs.  While the data contained within this database may speak volumes about, <u>inter alia</u>, how many acres are planted to each kind of crop, how much a farmer intends to plant following a harvest, whether acreages have been "double cropped," and whether land is irrigated, <u>see</u> Wieland Dec. at ¶ 52,  the acreages in that file says nothing about why farmer **x** receives one payment, farmer **y** receives another payment, and farmer **z** receives yet another payment.  While the information contained in the Compliance file may well be particularly attractive to Multi Ag Media in furtherance of its commercial end – marketing the data to vendors of agricultural goods and services – the fact of the matter is that this information is simply a collection of data at the farm and field level on hundreds of thousands of farms.  <u>See</u> Wieland Dec. at ¶ 46.  Conversely, the crop and acreage data that does shed light on FSA's subsidy programs, such as the CRP, AMTA and DCP data, have been provided to Multi Ag Media, because that data is more than just farm information that happens to be collected in government files: it is data that shows how the government subsidy programs operate.

     5.     A Person Does Not Need to Be Given an Assurance of Confidentiality in Order to <u>Have a Privacy Interest Protectable Under Exemption 6</u>

Multi Ag Media also argues that individual farmers submitting acreage and livestock information have no reasonable expectation of privacy in that information because FSA does not provide any assurances of confidentiality when it solicits the information.  <u>See</u> Pl. Opp. at 10.  Multi

14

Ag Media fails to cite any case law in support of the proposition that a promise of confidentiality must be made before an Exemption 6 privacy interest can be asserted. While it is certainly true that a promise of confidentiality "should generally be given weight on the privacy side of the scale," Washington Post v. Department of Health and Human Services, 690 F.2d 252, 263 (D.C. Cir. 1982), the statutory text of Exemption 6 does not require an express promise of confidentiality in order to trigger its protections. Compare 552 U.S.C. § 552(b)(6) with § 552(b)(7)(D); see also Ditlow v. Shultz, 379 F. Supp. 326, 329-31 (1974) (although no promise of confidentiality given, information provided on a customs declaration raises issues of personal privacy). In fact, even in instances where the government provides an express warning that supplied information could be subject to release, that warning is not a bar to the agency's subsequent invocation of Exemption 6. See Hill, 77 F. Supp.2d at 8; see also Lakin Law Firm v. Federal Trade Commission, 352 F.3d 1122, 1124 (7th Cir. 2003) (citing Hill).

> 6.    Plaintiff's Claim That It Has Received These Materials in The Past

Multi Ag Media's final argument as to the absence of a privacy interest is that FSA is somehow precluded from raising an Exemption 6 argument because it has released similar records in response to prior FOIA requests. See Pl. Opp. at 10 (citing Montandon Aff. at ¶ 15, 16). While this assertion might have some salience under FOIA's other exemptions, Exemption 6 (and 7(C)) are different. The fact that otherwise private information may have been placed in the public domain at one time does not mean that the person irretrievably loses his or her privacy interest in that information. A personal privacy interest belongs to the individual, not the government, and cannot be "waived" by the government's prior conduct.

For example, in Sherman v. United States Dep't of the Army, 244 F.3d 357, 364 (5th

Cir.2001), the requesting party argued that the Army's prior practice of disregarding an individual's privacy right in his or her Social Security Number effectively waived the Army's ability to rely on Exemption 6. Looking to the Supreme Court's holding that "the privacy interest at stake in FOIA exemption analysis belongs to the individual, not the agency holding the information," see Reporter's Comm, 489 U.S. at 763-65, the Fifth Circuit concluded that:

> only the individual whose informational privacy interests are protected by exemption 6 can effect a waiver of those privacy interests when they are threatened by an FOIA request. For that reason, we do not accept Sherman's argument that the Army has waived its authority to implement exemption 6.

Id. Further, the Sherman opinion acknowledged that the substantial weight of the decisional law considering this same issue in the Exemption 7(C) context (the personal privacy exemption for law enforcement records) also found that the government cannot waive an individual's privacy interest through prior disclosures. See Sherman, 244 F.3d at 364 n.12.[4] Other cases are in accord. See Lakin Law Firm, 352 F.3d at 1124 ("[m]oreover, the FTC cannot waive individual consumers' privacy interests – whatever it does or fails to do"); cf. August v. Federal Bureau of Investigation, 328 F.3d 697, 701 (D.C. Cir. 2003) (citing Sherman). Thus, notwithstanding any releases that may have been done in the past, FSA may assert Exemption 6 to prevent the release of information about

---

[4]Citing Fiduccia v. U.S. Dept. of Justice, 185 F.3d 1035, 1047 (9th Cir.1999) (concluding that Justice Department did not waive individual's privacy interest in investigation files recognized in exemption 7(C) by notifying public of ongoing criminal investigation involving individual); Halpern v. FBI, 181 F.3d 279, 297 (2d Cir.1999) ("Confidentiality interests [under exemption 7(C)] cannot be waived through prior public disclosure or the passage of time."); Computer Professionals for Social Responsibility v. U.S. Secret Service, 72 F.3d 897, 904 (D.C. Cir.1996) (recognizing that only individual with privacy interest in information could waive that interest for purposes of section 7(C) exemption); Massey v. F.B.I., 3 F.3d 620, 624 (2nd Cir.1993) ( "[W]e are not convinced that the doctrine of waiver applies to exemption (b)(7)(C).") Kiraly v. F.B.I., 728 F.2d 273, 279 (6th Cir.1984) (rejecting argument that by testifying in a trial related to a police investigation, an individual waived any privacy interest in FBI investigation records protected from public dissemination by exemption 7(C)).

individual and family farmers that would constitute an unwarranted invasion of personal privacy.[5]

**B.    There Is No Public Interest in Release of the Selected Fields that FSA Continues to Withhold From Disclosure**

In its opposition memorandum, Multi Ag Media makes frequent reference to the "contentious economic debates about fair distribution of farm subsidies" and "vigorous public debate" about payments being received by wealthy farmers. See Pl. Opp. at 16 (citing Nganje Aff. at ¶¶ 2, 4); see also Montandon Aff. at ¶ 28-30 (describing a series of National Public Radio programs featuring FSA subsidy programs). Multi Ag Media's interest in FSA records, however, has little to do with academic debates about government policy. Rather, Multi Ag Media is a quintessential commercial requester. As Mr. Montandon acknowledges in the opening paragraph of his declaration, his company is seeking access to data about farmers and farms so that the data can, in turn, be sold to other agricultural enterprises seeking to market their goods and services to the farmers. See Montandon Aff. at ¶ 1; see also www.fmid.net (the website for 'Farm Market iD,' the trade name for Multi Ag Media).

FSA recognizes that so long as there is a public interest in the release of agency records, those records must be made "promptly available to any person," 5 U.S.C. § 552(a)(3) (emphasis added) and that "[o]nce records are released, nothing in the FOIA prevents the requester from disclosing the information to anyone else." Swan v. SEC, 96 F.3d 498, 499 (D.C. Cir. 1996) ("FOIA does not make distinctions based on who is requesting the information"); see also Reporters

---

[5]Plaintiff also points to a "READ ME" note appended to Exhibit I of the Wieland Declaration as evidence that FSA had contemplated a release in full of the Compliance File. See Montandon Aff. at ¶ 17. The "READ ME" note indicates only what FSA's Kansas City Office was providing to Ms. Wieland. The note was an internal document, not a determination that a full and complete copy of the Compliance File would be provided to plaintiff. See Supp. Wieland Dec. at ¶ 27.

Committee, 489 U.S. at 771.  So, the fact that Multi Ag Media is likely to sell the information to other commercial enterprises for profit – and that these commercial enterprises will seek to profit by selling their goods and services to the very farmers whose information they are receiving – is not a reason, in and of itself, to sustain FSA's invocation of Exemption 6.   Rather, the point is that because Multi Ag Media's interest is in obtaining information that the "agricultural community" would be willing to purchase, that information is not necessarily information that would inform the public about the operation of the Department of Agriculture.

The parties do not seriously dispute the relevant law with respect to what constitutes a public interest in disclosure of information contained in government files. "FOIA's basic policy . . . focuses on the citizen's right to be informed about what their government is up to.  Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose." Department of State v. Ray, 502 U.S. 164, 177-78 (1991); see also National Archives and Records Administration v. Favish, 541 U.S. 157, 170 (2004).  On the other hand, "disclosure of information about private citizens that . . . reveals little or nothing about an agency's conduct" does not further a public interest.  Reporters Committee, 489 U.S. at 773.

FSA has reviewed Multi Ag Media's FOIA request cognizant of the fact that there is a public interest in the manner in which the agency operates its various subsidy and support programs.  In this regard, FSA produced the entirety of its Participating Producer File, which contains the names and addresses of agricultural producers who received a payment in at least one program administered by FSA in 2005. See Wieland Dec. at ¶ 7.  FSA also released its Producer Payment Reporting System, which reveals the payments issued by FSA to agricultural producers and entities in the 2005 program year. See id.  Thus, insofar as Multi Ag Media posits that the public interest is served because

18

release will show "why USDA gives **x** dollars to one farmer, **y** dollars to another farmer, and **z** dollars to yet another," Pl. Opp. at 2, that information has been released.

In contrast, the very limited number of data fields that FSA continues to withhold do not say anything about how subsidies are allocated or the bases upon which farmers and producers are provided other government benefits. For example, for one of the databases that remains at issue in this litigation, the Livestock Compensation Program (LCP), FSA has released to Multi Ag Media more than 1.4 million records. See Wieland Dec. at ¶ 32. The sole field that was withheld was one that contained the number of head of livestock owned by farmers by kind. See id. As explained in Ms. Wieland's declaration, there are substantial privacy interests in this information, with the starting point being that applicants to the program necessarily are farmers who are experiencing economic distress as a result of natural disasters. See id. The reason that personal privacy interests would be impacted by release of this information is that livestock can be pledged as a security interest, so knowing the number of head of livestock will reveal their economic value. See id. In other words, making public number of head of livestock owned by a farmer may well say something about the farmer and the farmer's financial condition, but nothing about FSA or the operation of the livestock compensation program. In sharp contrast, and indicative of the considerable consideration that FSA has given to Multi Ag's request,[6] among the 43 fields that FSA did release included data revealing both the amounts that agricultural producers and ranchers lost as a result of natural disasters, as well as the payment amounts that were received from the government under the LCP. See id. at ¶ 35. Consequently, Multi Ag Media did receive information showing which livestock producer received **x** dollars, which livestock producer received **y** dollars, and which livestock

---

[6]Indeed, Multi Ag Media has not challenged FSA's withholding on segregability grounds.

producer received **z** dollars. This is the information for which there is a cognizable public interest. In contrast, there is no public interest in merely making public the number of head of cattle a given livestock producer may own.

FSA's treatment of the Livestock Assistance Program (LAP) database is similar. The LAP program assists livestock owners who suffered grazing losses due to natural disasters. See Wieland Dec. at ¶ 37. FSA released 57 of the 63 fields associated with this database. See id. at 39. Included among the released information were the names and addresses of program recipients, the dates of the losses incurred, the rate used to calculate LAP benefits and the amount of losses that were covered by FSA. See id. at ¶¶ 43-44. FSA determined to withhold six fields that speak only to the financial condition of the individual livestock producers, such as the weight range description, the number of head of livestock, the number of days fed, the grazing loss percent, and the grazing acreage. See id. at ¶ 42a-42e (discussing what each of these fields represents and why the information in these fields would tend to reveal financial information about the individual producer). The privacy concerns are made even more acute by virtue of the fact that the producers in this database were experiencing a financial hardship due to an inability to feed their livestock following a natural disaster. See Wieland Dec. at ¶ 44-45. As FSA explained in its declaration, making public the extent of a rancher's financial loss would be a source of embarrassment and also could potentially subject that individual to unwanted attention and harassment by others. See id. at ¶ 45. Again, insofar as the fields in the LCP database would tend to show how FSA operates its subsidy programs or would reveal benefits received thereunder, those fields have been released.

The same is true of those parts of the Compliance file that are being withheld under Exemption 6, as discussed in detail in Part II.A.4, above. The Compliance file is a massive

electronic, tabular database that contains the types and numbers of crops as reported to agricultural producers to FSA.  See Wieland Dec. at ¶ 46.  This electronic file contains information describing crop data at the farm and field level on hundreds of thousands of farms in all 50 states and in United States territories, independent of any specific FSA program.  See Supp. Wieland Dec. at ¶ 18.  For one of the subparts of the Compliance File – the Compliance Detail – FSA has released 41 out of 49 fields.  See id. at ¶ 47.  For the other subpart, the Compliance Summary ,which contains over 7 million records, FSA released 24 of 39 fields.  See id. at ¶ 48. With respect to those fields that have been withheld, FSA has explained what the fields contain and why the information contained in those fields would tend to reveal financial information about farmers, with no corresponding information about how FSA operates its subsidy programs.  See Wieland Dec. at ¶ 52 (discussing the withheld data fields on a field-by-field basis).

Finally, for the GIS database, Multi Ag Media claims that this data should be released because "satellite images of virtually every address in the country are already available on the internet through Google Earth" and the government (apparently) does not object to the release of these satellite images on privacy grounds.  Montandon Aff at ¶ 14.  FSA cannot speak to the circumstances under which Google obtains the images available on Google Earth; however, as set forth in the Wieland declaration, the GIS database is far more than just a satellite picture of a farm. See Wieland Dec. at ¶¶ 55-62.  Moreover, FSA has released substantial portions of the GIS database including the shape attributes and CLU calculated areas.  See Wieland Dec. at ¶¶ 58.  What is being withheld is largely a series of codes and numbers assigned by FSA, along with one layer showing the official acreage calculated by GIS, and another layer showing whether any portion of the property contains wetlands.  See Wieland Dec. at ¶ 59; see also 61 (explaining the privacy interests for each

21

of these numbers, codes and fields). Multi Ag Media claims that "when a farm elects to receive substantial government monetary subsidies, that farm has no privacy interest in preventing disclosure of an FSA database of satellite images that FSA maintains to monitor eligibility and compliance with FSA programs." Montandon Aff. at ¶ 14. This statement is manifestly untrue. Certainly when issues or questions arise concerning eligibility and/or program compliance for an individual farm(s), there may be a public interest in the release of that information. But the idea that a FOIA requester should be able to obtain access to satellite images with all of FSA's coding and attributes for some 2.1 millions farms across the nation simply by virtue of the fact FSA maintains this information strains all credulity. Indeed, a satellite photo of a farm and its borders is <u>exactly</u> the kind of information that says much about the farm, but nothing about the Department of Agriculture.

Tellingly, Multi Ag Media's opposition memorandum never addresses what the public interest is in the <u>specific</u> data fields that FSA is continuing to withhold from disclosure. In the section of its opposition memorandum captioned "The Public's Interest Supports Release Of These Records," plaintiff only talks about the interest in FSA information generally, without any acknowledgment that copious information about these programs have already been released. The opposition falls short of the mark in that it never squarely addresses the public interest in the limited number of data files that remain in dispute. <u>See</u> Supp. Montadon Aff. at ¶ 3 (listing those fields). So Multi Ag Media has failed to show what public interest is served by revealing, for example, whether a given farmer elects to irrigate his crops, the number of rows of tobacco or cotton crops on a given farm, or the width between rows. <u>See</u> Wieland Dec. at ¶ 52a, 52b. There can be little doubt that it is because the withheld fields from the LCP, LAP and Compliance File say so much about the individual farmers and their acreage, crops, soil and livestock (and so little about FSA operations)

that Multi Ag Media seeks to gain access to these databases and fields.  But with plaintiff having failed to meaningfully address the public interest in the "quite small" number of files set forth in Paragraph 3 of the Supplemental Montandon Declaration, the agency's assertion of Exemption 6 should be affirmed.  Pl. Opp. at 8.

### III.  CONCLUSION

Wherefore, for the reasons set forth above and as set forth in Defendant's Motion for Summary Judgment, defendant's Motion should be granted, judgment should be entered for defendant, and this matter should be dismissed with prejudice.


_____/s/_____
KENNETH L. WAINSTEIN, D.C. Bar # 451058
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____/s/_____
PETER D. BLUMBERG, Bar # 463247
Assistant United States Attorney
United States Attorneys Office
Judiciary Center Building
555 4th Street, N.W., 10th Floor
Washington, D.C. 20530
(202) 514-7157

Attorneys for Defendants

Dated: July 3, 2006