IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MULTI AG MEDIA, LLC,                )<br>                                                        )<br>            Plaintiff,                          )<br>                                                        )<br>vs.                                               )            Civil Action No. 05-1908 (HHK)<br>                                                        )<br>UNITED STATES DEPARTMENT OF  )<br>AGRICULTURE, FARM SERVICE    )<br>AGENCY,                                     )<br>                                                        )<br>            Defendant.                     )<br>_____  ) | |

## SECOND DECLARATION OF ROBIN WIELAND

1.      My name is Robin Wieland and I am a Paralegal Specialist with the United States Department of Agriculture (USDA), Farm Service Agency (FSA). I am the FSA employee who provided a supporting declaration, dated February 15, 2006, that was filed as a part of USDA's Motion for Summary Judgment involving Multi Ag Media's action brought pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. §552. In that earlier declaration, I described my previous duties and my current position and responsibilities with FSA.

2.      As explained in my earlier declaration, I was employed with FSA, beginning in 1984, as a Program Technician and a Management and Program Analyst. From 1984 to 1992 as a Program Technician, I worked in FSA county offices where I carried out activities and functions pertaining to FSA farm programs. This involved working directly with individual farmers and ranchers, collecting certain information

about their farming operations, and maintaining the records and files concerning these individuals. I assisted individual producers in applying for FSA's programs and filing their annual acreage reports.

3. During my time as a Program Technician, I acquired the knowledge necessary to understand FSA records and the purposes for which FSA collects personal information from farmers and ranchers. It is important to note that it is this same type of information collected at the individual FSA county office level that is at issue in Multi Ag Media's FOIA request and appeal. While FSA maintains this information in a central database located in Kansas City, Missouri, FSA initially obtains this information on individuals and closely-held businesses from its almost 2,500 county offices.

4. From 1992 to 2004, as a Management and Program Analyst, my primary responsibilities were conducting detailed reviews of FSA program and administrative operations and reporting findings of such reviews to FSA management. These reviews were completed by examining and analyzing FSA records on individual producers in order to ensure that Government resources are protected against fraud, mismanagement, or misappropriation, and that FSA's programs are effectively and efficiently managed. During my time as a Management and Program Analyst, I acquired the additional skills necessary to analyze FSA records and files in order to report to management on how FSA administers its programs.

5. Since January 2004 as a Paralegal Specialist, my responsibilities include analyzing FSA records, in any format, in terms of the administrative appeal process of

2

FOIA and the Privacy Act. I prepare materials that are used by the USDA Office of the General Counsel and the U.S. Department of Justice as FSA's representative in FOIA litigation. As a Paralegal Specialist, I continue to analyze FSA records and the type of information obtained and compiled on individual farmers and ranchers, in light of requests for this information from the public.

6. It is correct that certain information in the following data files remain in dispute in this case: a) Livestock Compensation Program (LCP); b) Livestock Assistance Program (LAP); c) Compliance File; and d) Geographic Information System (GIS), Common Land Unit (CLU) database. The type of information in each separate database and the specific information that FSA withheld on appeal, pursuant to Exemption 6 of FOIA, was described in my earlier declaration at ¶¶ 30 – 61.

7. The eight data fields in the Compliance Detail File and the 15 data fields in the Compliance Summary File that FSA has not released to Multi Ag Media were described in my declaration at ¶47 and ¶48. The data in these fields pertains to specific acreage categories by crop at the field level that is reported to FSA by agricultural producers who have an interest in the information.

8. Of the eight fields addressed by Mr. Montandon in this Supplemental Affidavit, dated May 31, 2006, six are contained in the Compliance Summary File. Mr. Montandon identifies the remaining two fields as the cropland acres and farmland acres fields. These two fields are not included in the record layout for each record in the Compliance Summary and Compliance Detail file that FSA determined was responsive to

3

Multi Ag Media's FOIA request, dated July 13, 2005. The Compliance File record layout was included as Exhibit I of my declaration.

9. The two fields that reveal total cropland acres and total farmland acres by tract and farm level were included in each of the nearly 8.5 million records in the Agricultural Market Transition Act (AMTA) tract file that was released to Multi Ag Media on October 20, 2005, in response to its October 3, 2005, FOIA request. Each record in the AMTA file that was released on October 20, 2005, included a farm sequence number, which was a value created and substituted for the actual farm serial number. In response to Multi Ag Media's August 24, 2005, appeal, FSA determined to release the actual farm serial number and on April 20, 2006, provided the same AMTA tract file with the farm serial number. The cropland acres and farmland acres that Mr. Montandon states Multi Ag Media has not received from the Compliance File were provided as of the AMTA Tract File on April 20, 2006.

10. In Mr. Montandon's supplemental affidavit, he states that subsequent to his earlier request, Multi Ag Media has received the data files that USDA has claimed to have released. Briefly, since February 15, 2006, in addition to the AMTA Tract file, USDA re-released the Conservation Reserve Program (CRP) Contract file, the Direct and Counter Cyclical Payment (DCP) Program file, and that portion of the Compliance file that FSA determined was releasable, with the farm serial number. These files were provided to Multi Ag Media on April 12, 2006, and April 20, 2006. The Actual

4

Production History (APH) file was also released on April 20, 2006. On June 23, 2006, USDA released the Permitted Entity file.

11. In Mr. Montandon's affidavit, dated March 3, 2006, at ¶¶19-21, he attempts to explain the different types of farming operations and information on each type of operation that is maintained in FSA's databases. It is important to understand that FSA collects the names, addresses, and details about farming operations from individuals and business entities that do not participate in, or receive subsidy payments, from an FSA program. These individuals and entities may be the landowner of a tract or the operator or other tenant on a farm and therefore, will be included in the master name and address file and farm and tract file, but will not be included in specific FSA program files, such as the CRP contract AMTA tract, and DCP files.

12. On July 13, 2005, one of the files that Multi Ag Media requested was the Participating Producer Name and Address file. On or about August 8, 2005, this file was released to Multi Ag Media. This file was limited to only those producers, both individuals and entities, from the master name and address file that are participating in at least one FSA program and are receiving a subsidy payment from FSA. As a result, Multi Ag Media, based on the release of certain farm and tract files, is able to link certain crop acreage and crop yield information with the identity of the individuals and closely-held businesses that have an interest in this information.

13. Multi Ag Media requested data from specific FSA program files: CRP, AMTA tract, DCP, LAP, LCP, and APH that is used to administer the Non Insured Crop

5

Assistance Disaster Program. In order for an individual or business entity to receive FSA payments they must have an interest in the farming operation. They must own or rent the land and have an ownership interest in the agricultural commodity produced, which could be crops, livestock, or a combination of both. These producers must have a share of the profits or losses from the farming operation commensurate with their contribution to the farming operation and their contributions to the farming operation are at risk. Contributions can be in the form of active personal labor or active personal management, or a combination of both, and capital, land, or equipment or a combination there of.

14. For many of FSA's programs for the years 2003 – 2007, individuals and entities whose average adjusted gross income exceeds $2.5 million in the three tax years immediately preceding the year for which benefits are requested and less than 75% of their average adjusted gross income is derived from farming, ranching, or forestry operations will not be eligible to receive FSA payments.

15. In other words, the producer names and addresses that were released to Multi Ag Media represent individuals and closely held businesses that make farming and ranching their livelihood. These individuals and businesses can be the owner of the land who has an ownership share of the crop planted on their land, the operator who has general control of the farm on a daily basis, or a sharecropper whose share in the crop is in return for their labor. These producers have a personal interest in certain details about their farming operations that could tend to reveal their financial status, wealth, or poverty. The acreage and yield information in these files pertain to these individuals and closely-

6

held businesses. It is these individuals and entities, as opposed to farms, that apply for, and participate in FSA's programs. Further, FSA issues payments to these individuals and entities, based on their eligibility criteria.

16. Mr. Montandon, in his Supplemental Affidavit, at ¶¶ 7 – 9, explains that the information in the Compliance File should be released because FSA has already released the same information on some farms, but not all farms, from other files. Based on this, he concludes that there are two groups of farms and further, FSA has not explained to him the distinction between these two groups of farms.

17. The type of farm data maintained in each of the files that is at issue in Multi Ag Media's FOIA request is distinctly different. Multi Ag Media has been provided acreage and yield information that pertains to identifiable individuals and entities from the CRP file, AMTA file, and DCP file. These three files contain information specific to those FSA programs.

    a. <u>CRP Contract file</u>: CRP is a voluntary program that requires participating landowners to take their cropland out of production for between 10 and 15 years. Producers who have acres enrolled in CRP agree to plant such acreage to a vegetative cover, which improves water quality, controls soil and water erosion, and enhances wildlife habitat. By way of reference, a vegetative cover is planted vegetation that protects the land, and includes perennial grasses, legumes, and forbs or shrubs.

7

        The acreage in this file includes only the number of acres, by farm, that has been enrolled in this conservation program by the landowner or operator. This file does not include any other type of acreage.

b.     <u>AMTA Tract File</u>: By way of background, this FSA program was in effect from 1996 through 2002. Payments were based on 85 percent of the <u>contract acreage</u> for each enrolled crop.

        The contract acreage applied to only those crops eligible to participate in AMTA. Those crops were wheat, corn, grain sorghum, barley, oats, upland cotton, and rice. This acreage was calculated by averaging the respective crop's planted acreage and acreage considered planted to that crop for the years 1991 through 1995, for all crops except cotton and rice. For cotton and rice, the years used were 1993 through 1995. This acreage amount is the *established historical average* of actual planting history over a specific time period, as mandated by program regulations.

        It is contract acreage that is included in the AMTA file and that was provided to Multi Ag Media. As explained previously, total farmland and cropland acreage, at the tract level, was also included in the AMTA Tract file.

c.     <u>DCP File</u>: By way of background, this FSA program replaced the AMTA Program, which ended in 2002. Individuals and entities enrolled their farms

in DCP for the years 2002 through 2007. Payments are based on 85 percent of the <u>crop base acreage</u> for each enrolled crop.

The crop acreage base applies to only those crops eligible to participate in DCP. Those crops are wheat, corn, grain sorghum, barley, oats, upland cotton, rice, peanuts, soybeans, and other oilseeds. Farm owners were provided a one-time opportunity to choose from five options in determining DCP base acres depending on the type of crop. The 2002 AMTA contract acreage could be used, with oilseed history for the years 1998 through 2001, or calculate all crop base acres using the farms planted and approved prevented planted history for 1998 through 2001. Like AMTA, DCP base acreage amounts are the *established historical average* of actual planting history over a specific time period, as mandated by program regulations.

It is crop base acreage that is the type of acreage included in the DCP file and that was provided to Multi Ag Media.

18.   The fields in the Compliance File at issue in Mr. Montandon's Supplemental Affidavit were described in my declaration at ¶52. The type of crop and acreage information in the Compliance File, in and of itself, is independent of any specific FSA program. The information in this file includes all crops, by field, that individuals and entities planted on a farm and in which they have an ownership interest.

As a result, this file will include crop and acreage information for crops not included in the DCP and AMTA Tract files.

19.     However, with regard to the type of crops that are common to both DCP, AMTA Tract, and Compliance files, the acres in the DCP and AMTA Tract file represent established historical averages, while the acreage for the same crop in the 2005 Compliance File will reflect actual acres planted to the crop in that crop year. This means that while corn or wheat are types of crops common to all three files, the acreage of corn or wheat in each file will be different.

20.     These individuals and closely held businesses have a greater privacy interest in the type of acreage maintained in the Compliance File because it represents the amount of all crops planted in a specific crop year. Unlike the CRP file, which reflects only that land on a farm devoted to CRP, the 2005 Compliance File reflects hundreds of thousands of entire farms owned and operated by individuals and entities that derive their livelihood from growing and harvesting those crops. FSA has determined that the personal privacy interest of the individuals and closely held businesses that report this information to FSA would be threatened if the actual planted acres of a particular crop were disclosed.

21.     The public interest in disclosing the acres planted to a particular crop by individuals and closely held businesses was explained in my declaration at ¶53. Certain information in the Compliance File, because it is not a specific FSA program file, but rather a pure reflection of what is planted on individuals farms, does not shed any light on

how FSA conducts its activities, which was Congress's core purpose for enacting the FOIA. It should be noted that Mr. Montandon has not established that disclosure of the number of acres that individual farmers and businesses plant to a particular crop on their farms will significantly educate the public on FSA's activities.

22. Mr. Montandon's conclusions about what he can determine about a specific farm based on the information he has been provided is only partially correct.

23. With regard to farms that are comprised of only one tract, Mr. Montandon is correct in concluding that Multi Ag Media can determine their acreage only if the producers of those farms enrolled their entire farming operations in CRP.

24. However, because there is no correlation between the acreage in the AMTA Tract File and the DCP file with the acreage amounts in the Compliance File, Mr. Montandon is not correct when he argues that he can determine complete crop and acreage data on nearly one quarter of all farms included in the Compliance File.

25. The FSA farm and tract information that Multi Ag Media was provided will only reveal: a) those farms entirely devoted to CRP; b) the type of crops that individual farmers and entities planted in 2005; and c) the established historical average acreage for certain crops that FSA used as the basis for payments in the AMTA program in the year 1996 through 2002, and that FSA is currently using through the year 2007 for payments issued under the DCP program.

26. FSA's determination to withhold the data fields from the Compliance file that reflect actual acres planted to a crop is not based on the type of farm. The type of

11

acreage and the privacy implications associated with that type of acreage, balanced with the public interest in disclosing this information, was the test used by FSA.

27. In Mr. Montandon's Affidavit, dated March 3, 2006, he asserts that the "ReadMe Note," dated September 21, 2005, which was attached to my declaration as Exhibit I, states that a complete copy of the Compliance Detail File and Compliance Summary File would be provided. This six-page readme note and record layout was provided to me by FSA's Kansas City Administrative Office for the purposes of describing the total number of records located and determining the records responsive to Multi Ag Media's request. This readme note and record layout was used to analyze each field in the record in order to determine the maximum amount of information that could be released. The readme note is an internal document, and was not intended to convey a determination by FSA to provide a full and complete copy of the Compliance file to Multi Ag Media.

I declare under penalty under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed in Washington, D.C., on this 3rd day of July, 2006.

ROBIN WIELAND
Paralegal Specialist
USDA, Farm Service Agency

12